**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4378
_____

UNITED STATES OF AMERICA

v.

ABRAHAM CRUZ,
                    Appellant

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal No. 1-11-cr-00242-001)
District Judge: Hon. Christopher C. Conner

_____

Argued June 10, 2014

BEFORE: FISHER, COWEN AND TASHIMA*,
<u>Circuit Judges</u>

_____

*Hon. A. Wallace Tashima, Senior United States Circuit
Judge, United States Court of Appeals for the Ninth Circuit,
sitting by designation.

(Filed: July 10, 2014)


Frederick W. Ulrich, Esq. (Argued)
Office of the Federal Public Defender
100 Chestnut Street, Suite 306
Harrisburg, PA 17101

      Counsel for Appellant

Stephen R. Cerutti, II, Esq. (Argued)
Kim D. Daniel, Esq.
Office of the United States Attorney
228 Walnut Street, P.O. Box 11754
220 Federal Building and Courthouse
Harrisburg, PA 17108

      Counsel for Appellee

_____

OPINION

_____


COWEN, Circuit Judge.

We here confront an issue of first impression: whether the Government, pursuant to the Supreme Court's decision in *United States v. Sell*, 539 U.S. 166 (2003), can have a sufficiently important interest in forcibly medicating a defendant to restore his mental competency and render him fit

2

to proceed with sentencing. Under the facts presented in this case, we answer that question in the affirmative and we will affirm.

## I.

## A.

Cruz was arrested in August of 2011 and indicted on one count of assaulting, resisting, or impeding Social Security Administration ("SSA") employees, a violation of 18 U.S.C. § 111 ("Count I"), and two counts of threatening a federal law enforcement officer, violations of 18 U.S.C. § 115 (respectively, "Count II" and "Count III"). The District Court granted Cruz a judgment of acquittal on Count I, and a jury returned guilty verdicts on Count II and Count III.

In August of 2012, after the District Court received but before Cruz could raise objections to the pre-sentence investigation report ("PSR"), the Government raised concern about and moved for a determination of Cruz's competency.[1] Its motion was granted, and Cruz was evaluated by Dr. William J. Ryan, a forensic psychologist working for the Federal Bureau of Prisons ("BOP"). Dr. Ryan, as reflected in a report submitted to the District Court, concluded that Cruz was mentally incompetent because he suffered from

---

[1] The Government sought a competency determination at this stage of the proceedings because "Franklin County prison officials [had] complained about Cruz's behavior." (App. 69.)

3

schizophrenic disorder, bipolar type. Upon receipt of Dr. Ryan's report, the District Court scheduled a competency hearing. Following that hearing, it concluded that Cruz was mentally incompetent and found that he could not proceed with sentencing.

The District Court received a second competency evaluation and report from the BOP in May of 2013, which was co-authored by forensic psychologist Angela Weaver and BOP staff psychologist Robert Lucking. Drs. Weaver and Lucking concurred with Dr. Ryan's diagnosis, noted Cruz's ongoing refusal to take anti-psychotic medication recommended by BOP personnel, and concluded that without such medication Cruz would remain mentally incompetent. They also concluded that "there is a substantial probability that [his] competency can be restored with a period of" forced medication. (App. 70.) The Weaver/Lucking report included a proposed treatment plan and a request that the Government seek a court order under *Sell*, authorizing the BOP to medicate Cruz involuntarily.

**B.**

The Government filed a motion on May 29, 2013, seeking an order authorizing the BOP to medicate Cruz against his will. (*See* App. 68-142.) The papers filed by the Government included, *inter alia*, its "Omnibus Motion and Brief," related exhibits, and, pursuant to the District Court's local rules, a certificate indicating that Cruz's lawyer was contacted and expressed Cruz's non-concurrence in the motion. The Omnibus Motion and Brief made clear that the

4

Government sought two forms of relief: first, a hearing pursuant to *Sell*; and second, following the hearing, a court order authorizing forced medication.

The District Court promptly scheduled an evidentiary hearing, which was continued three times (twice at Cruz's request) and ultimately held on October 22, 2013. In the intervening five months—i.e., the period following the May 29, 2013 filing of the motion and preceding the October 22, 2013 hearing—Cruz failed to file a petition, motion, brief, or other document indicating that he opposed the Government's ultimate request for relief.

The District Court began the October 22, 2013 hearing by informing the parties that it was "held pursuant to the Supreme Court decision in *Sell v. United States*" and providing "the *Sell* criteria sort of as a backdrop to the testimony" that would be presented. (App. 145, 147.) It reminded the parties that "involuntary medication of nondangerous individuals should only occur when four conditions are satisfied" and recited those factors for their benefit:

> First, the court must find that important governmental interests are at stake. Second, the court must conclude that involuntary medication will significantly further those interests, and this second factor includes determining that medication is substantially likely to render the defendant competent and that the treatment is unlikely to have side effects

5

that impair the defendant's ability to assist counsel.

Third, the court must determine that involuntary medication is necessary to further those interests because alternative[,] less intrusive treatments are unlikely to achieve the same results. And fourth, the court must find that involuntary medication is medically appropriate, or, in other words, in the patient's medical interests in light of his medical condition.

The first factor, whether the government has advanced sufficiently important interests to justify forcible medication, is a question of law, and the remaining three factors are factual questions which the government must prove with clear and convincing evidence . . . .

So in light of those factors and that background, . . . I'll turn to the government and ask . . . if [it] would like to present testimonial evidence in support of [its] motion.

(App. 147-49.)

Drs. Weaver and Lucking testified for the Government, which introduced, among other documents, both the PSR and the May 2013 Weaver/Lucking report. Cruz, who was represented by the Federal Public Defender, did not object to the introduction of either of those documents. However, he noted through counsel that he "didn't necessarily agree with that guideline range." (App. 229.)

6

Shortly thereafter, again acting through counsel, he declined the opportunity to present evidence at the hearing and stated that he "[did not] have any argument at [that] juncture." (App. 230.)

The District Court took the matter under advisement and two days later entered the order that is at issue on appeal. As there illustrated, the District Court considered the circumstances of Cruz's case and concluded that all four of the *Sell* criteria were satisfied. Its analysis of the first criterion, which is central to this appeal, rested on two legs.

First, the District Court concluded that a sufficiently important government interest was at stake because "[r]endering a defendant competent for sentencing enables not only the government, but also the court and the defendant himself, to ensure that the defendant receives a sentence that accurately reflects the nature of his offense and his individual circumstances." (App. 7 (citing *United States v. Wood*, 459 F. Supp. 2d 451, 457-60 (E.D. Va. 2006)).) It further explained:

> Neither the Supreme Court nor the Third Circuit ha[s] promulgated a test to determine the seriousness of a crime, but other circuits have looked to the statutory maximum mandated for the offense or the applicable guidelines range. The Third Circuit in [*United States v.* ]*Grape*[, 549 F.3d 591, 600 (3d Cir. 2008),] determined that under either rubric, the defendant was accused of "serious" crimes

7

because the crimes had statutory mandatory minimums of 10 and 15 years and the defendant had a guidelines range of 87 to 108 months['] imprisonment.

In the case *sub judice*, the draft pre-sentence investigation report provisionally identifies a 10-year statutory maximum for each count and a guidelines range of 100 to 125 months['] imprisonment. Certainly, pursuant to the criteria set forth in *Grape*, Cruz was convicted of "serious" crimes and the government possesses a strong interest in rendering him competent for sentencing.

(App. 7-8 (citations omitted).)[2]

Second, the District Court found that no special circumstances lessened the importance of the Government's interest. It noted that *Sell* identified two examples of such special circumstances: "(1) when the defendant has already been incarcerated for a significant period of time; or (2) whether there is a possibility of future civil commitment." (App. 8.) But it concluded that neither of those circumstances were present here.

---

[2] The District Court was "mindful . . . that neither party . . . had the opportunity to lodge objections to the pre-sentence investigation report's findings" and noted that it had not "yet . . . consider[ed] the many circumstances that may contribute to Cruz's ultimate sentence." (App. 5 n.1.)

With respect to the length of Cruz's incarceration, the court concluded that he had not been incarcerated for a significant amount of time. It cited and discussed *Grape*, where this Court noted that the defendant had been incarcerated for approximately three and half years but "reasoned that in light of [his] potential sentence, he would still need to serve a majority of his sentence if convicted." (*Id.* (citing *Grape*, 549 F.3d at 602).) The *Grape* court concluded as a matter of law that that defendant had not been incarcerated for a significant amount of time. By analogy, the District Court reached the same conclusion here. It reasoned that Cruz, who had been incarcerated for only two years, might still need to serve the majority of his sentence. When reaching that conclusion, the District Court relied principally upon the PSR, which "provisionally identifie[d] a 10-year statutory maximum for each count and a guidelines range of 100 to 125 months['] imprisonment." (*Id.*)

With respect to the possibility of future civil confinement, the District Court examined the statutes that might authorize such confinement, 18 U.S.C. § 4246 and 50 Pa.C.S. § 7301, and noted each statute's prerequisites to civil confinement. Importantly, 18 U.S.C. § 4246 required "a substantial risk of bodily injury to another person or serious damage to property of another" while 50 Pa.C.S. § 7301 required a showing of "clear and present danger or harm to others or to himself." In light of those prerequisites, the District Court made note of record evidence that called into question the likelihood that Cruz could be civilly committed. Although "the [PSR] indicate[d] that Cruz has a lengthy criminal history involving numerous acts of violence and

9

threats of violence," and although "[e]ntries from the [BOP]'s Psychology Data System . . . indicat[ed] that Cruz ha[d] continued to threaten violence against others," "[t]he May 2013 evaluation explicitly state[d] that Cruz ha[d] not posed a threat to himself or others . . . and does not pose a risk of committing serious harm to others." (App. 9-10.) The District Court characterized the conflict in the record as "[u]ncertainty surrounding the" likelihood that "Cruz [could] be civilly committed" in the future and concluded that such uncertainty did "not materially diminish" and "clearly [did] not undermine" the Government's interest in restoring Cruz's mental competency to render him fit to proceed with sentencing. (App. 10.)

## C.

Cruz moved for a stay of the District Court's order on October 29, 2013. In the brief filed in support of that motion ("Stay Brief"), he conceded that "the government has an interest in sentencing a convicted defendant." (Supplemental App. 9.) However, he argued that the District Court erred in finding that special circumstances did not lessen the importance of the Government's interest.

Cruz first argued that the District Court erred when it concluded that he had not been incarcerated for a significant amount of time. He disagreed with the District Court's reliance on the PSR, and he argued that such reliance was inappropriate because he had not yet had an opportunity to object to the Guidelines, argue for relevant departures, or raise other considerations under 18 U.S.C. § 3553(a).

10

Specifically, he argued that it was unclear whether he needed to serve a majority of his sentence. (Supplemental App. 6.)

He also argued, with specific reference to both 18 U.S.C. § 4246 and 50 Pa.C.S. § 7301, that "it is quite possible that [he] could be civilly committed in the future." (*Id.*) He failed, however, to flesh out that argument by either developing it further or citing relevant legal sources.

The Government did not oppose Cruz's stay motion, which the District Court granted. Thereafter, Cruz filed this appeal.

## II.

We pause here to restate the arguments that Cruz presents on appeal and to draw a roadmap for our analysis. Cruz argues that the District Court erred when it authorized the BOP to forcibly administer antipsychotic medication because the first *Sell* criterion, which concerns the importance of the Government's interest in restoring his competency, was not adequately established. He raises five arguments that bear on that issue.

First, he argues that the Government's interest in restoring his competency is less than that shown in other cases (e.g., *Grape* and *Sell*) because, here, the Government merely seeks to restore his mental competency for sentencing. He thus seeks to distinguish his case from the vast majority of cases under *Sell*, where the Government seeks to restore a defendant's competency before trial has begun. He then

11

argues that the Government lacks an important interest here because the crimes at issue, violations of 18 U.S.C. § 115, are less serious than the crimes that were at issue in *Grape* and *Sell*.

Cruz next raises arguments that concern the District Court's reference to and, in some sense, reliance on the PSR. He contends that such reliance was misplaced because he had not yet had an opportunity to object to the Guidelines range calculated in the PSR, which was based on a career-offender enhancement. He also finds fault with the District Court for relying on the PSR because it does not take into account his mental health status, which could serve as a basis for either a downward departure or variance.

Finally, he states that it is very likely that he will be civilly committed to a suitable facility for care and treatment and that such likelihood constitutes a special circumstance that undermines the Government's interest.

The Government responds that Cruz failed to raise these issues before the District Court and urges us to review those issues only for plain error. *Cf.* FED. R. CRIM. P. 52(b). It also asserts that no error was committed, plain or otherwise, in the *Sell* proceedings before the District Court.

Our discussion will begin with the threshold inquiry raised by the Government: the appropriateness of plain error review. We thereafter turn our attention to the *Sell*-specific standard of review, which we have not had cause to examine

since our 2008 decision in *Grape*. Finally, we will examine the merits of each of Cruz's arguments.[3]

### III.

The District Court had jurisdiction under 18 U.S.C. § 3231 because Cruz was charged with violations of federal law. It is well-settled that we have jurisdiction under the collateral order exception to 28 U.S.C. § 1291. *See, e.g.*, *Grape*, 549 F.3d at 597.

### IV.

Cruz disputes the Government's invocation of plain error review on three grounds. First, he argues that plain error review cannot rise here under Federal Rule of Criminal Procedure 52(b) because the appeal does not concern a purely "criminal" issue. Second, he argues that the Government's invocation of plan error review "overlooks significant factual

---

[3] Ordinarily, we would determine as a threshold matter whether our analysis is better couched under *Sell* or, alternatively, *Washington v. Harper*, 494 U.S. 210 (1990). *See, e.g.*, *United States v. Dillon*, 738 F.3d 284, 290 (D.C. Cir. 2013). Here, the District Court received psychological evaluations that rendered *Harper* inapplicable because they demonstrated that Cruz was not a danger to himself or others. Those evaluations accorded with the Government's position before the District Court and similarly accord with its position on appeal. Thus, we will proceed under *Sell* without further discussion.

13

and procedural aspects of this case that belie the application of such a standard." (Reply Br. at 3.) Finally, he contends that the arguments at issue raised on appeal were preserved in the Stay Brief.

Upon full consideration of Cruz's arguments, we have concluded that they have little merit. For the reasons that follow, we will review this appeal only for plain error.

**A.**

Cruz first argues against the Government's invocation of plain error review because the Federal Rules of Criminal Procedure neither explicitly recognize nor provide a framework for objections in *Sell* proceedings. He thus distinguishes the instant appeal from an appeal from, for example, denial of traditional post-trial motions. He also argues that the absence of such framework precludes the forfeiture of arguments that he could have raised but did not raise in the District Court's *Sell* proceedings.

Cruz's arguments invite consideration of traditional notions of issue preservation, forfeiture, and waiver. Forfeiture, of course, is not exactly the same as waiver; rights may be forfeited without being waived. *See Freytag v. Comm'r*, 501 U.S. 868, 895 (1991) (Scalia, J., concurring in part and dissenting in part). The distinction between those terms is particularly important in criminal appeals. We will review issues and arguments that were forfeited before the District Court but, as a general rule, we will not examine those that were knowingly and intelligently waived. *See, e.g.*,

14

*Gov't of the V.I. v. Rosa*, 399 F.3d 283, 290-91 (3d Cir. 2005) ("'[W]here there was forfeiture, we apply a plain error analysis; where there was waiver, we do not.'" (citation omitted)).

The Supreme Court considered the differences between forfeiture and waiver in *United States v. Olano*. There, in the context of a criminal appeal, the Court rejected the bright-line application of waiver doctrines to an issue that was merely forfeited during trial and presented for the first time on appeal. *See United States v. Olano*, 507 U.S. 725, 732-34 (1993). It noted that "[a] rigid and undeviating judicially declared practice under which courts of review would invariably and under all circumstances decline to consider all questions" that were forfeited "would be out of harmony with . . . the rules of fundamental justice." *Id.* at 732 (citation and internal quotation marks omitted). "Although in theory it could be argued that '[i]f the question was not presented to the trial court no error was committed by the trial court [and] hence there is nothing to review,'" the Court rejected that theory, noting that it was "not the theory that Rule 52(b) adopts." *Id.* at 733 (first alteration in original; citation omitted).

The Supreme Court further explained in *Olano* that plain error includes any "[d]eviation from a legal rule" that is not explicitly, knowingly, and intelligently waived (e.g., through a guilty plea made pursuant to Rule 11). *See* 507 U.S. at 732-33. The parties do not assert and the record does not support a finding of such waiver here. Thus, the plain language of Rule 52(b) appears to belie Cruz's argument, as

15

that rule applies to *any* "plain error that affects substantial rights."  FED. R. CRIM. P. 52(b). [4]

Finally, it is noteworthy that this Court's review for plain error would comport with other courts' application of

_____

[4] We are sensitive to the fact that this appeal concerns Cruz's "substantial rights," in the colloquial sense.  Indeed, we are sensitive to the significant liberty interest at stake: Cruz's interest "in avoiding the unwanted administration of antipsychotropic drugs."  *Harper*, 494 U.S. at 221.  There are "several dimensions" to that liberty, which "are both physical and intellectual.  Every violation of a person's bodily integrity is an invasion of his or her liberty. . . .  And when the purpose or effect of forced drugging is to alter the will and the mind of the subject, it constitutes a deprivation of liberty in the most literal and fundamental sense."  *Id.* at 237-38 (Stevens, J., concurring in part and dissenting in part); *see also id.* ("The liberty of citizens to resist the administration of mind altering drugs arises from our Nation's most basic values.").

We note, however, that the appeal also concerns "substantial rights" in the sense contemplated by Rule 52(b) and characterized in *Olano* as rights that affect the outcome of a proceeding.  The order authorizing the BOP to forcibly medicate Cruz plainly meets that test.  *See, e.g.*, *Sell*, 539 U.S. at 176-77 ("By the time of trial [the defendant] will have undergone forced medication—the very harm that he seeks to avoid.  He cannot undo that harm even if he is acquitted. Indeed, if he is acquitted, there will be no appeal through which he might obtain review.").

that standard to similar appeals.  *See Dillon*, 738 F.3d  at 287 (recognizing forfeiture of argument on the first *Sell* criterion and related "special circumstances," and reviewing appeal for plain error); *United States v. Baldovinos*, 434 F.3d 233, 239 (4th Cir. 2006).

**B.**

Cruz next argues that any assertion of forfeiture "overlooks significant factual and procedural aspects of this case that belie the application of" plain error review.  (Reply Br. at 3.)  Specifically, he argues that his appellate arguments warrant *de novo* review because he lacked an opportunity to oppose the Government's motion.  Essentially, his argument tracks Rule 51(b) of the Federal Rules of Criminal Procedure, which provides in pertinent part: "If a party does not have an opportunity to object to a ruling or order, the absence of an objection does not later prejudice that party."  FED. R. CRIM. P. 51(b).

We see little merit in this argument.  Review of the District Court proceedings plainly demonstrates that Cruz enjoyed but failed to avail himself of several opportunities to oppose the Government's motion.

Cruz initially faults the Government for asserting that he failed to respond to its motion.  This aspect of his argument has two parts.  First, he cites the Government's certificate of non-concurrence (i.e., the certificate included in its motion papers) as evidence of his opposition.  Second, and of purportedly "[g]reater significance," he notes that the

17

District Court scheduled an evidentiary hearing only six days after the Government filed its motion. Because the District Court granted the Government some of the relief that it sought, he posits that there existed no basis for a response.

We find no merit in the argument that relies on the Government's certificate of non-concurrence. That certificate was filed pursuant to the District Court's Local Rules, which require the movant to certify that it "sought concurrence in the motion from each party, and that it ha[d] been either given or denied." M.D. PA. L. R. 7.1. By filing the certificate, the Government met its burden. But the Government's filing cannot be construed as meeting Cruz's burden of filing meaningful opposition. This conclusion rests on both the District Court's adoption and interpretation of its Local Rules. The District Court has made clear that a party opposing a motion must file an opposition brief. *See Nat'l Med. Care, Inc. v. Am. Renal Assocs., Inc.*, No. 1-702, 2002 WL 31107534, at \*5 n.5 (M.D. Pa. Sept. 17, 2002); *GGIS Ins. Servs., Inc. v. Lincoln Gen. Ins. Co., Inc.*, No. 10-932, 2011 WL 484180, at \*2 n.3 (M.D. Pa. Feb. 7, 2011). Indeed, Middle District Local Rule 7.6 provides the framework for timely-filed opposition and states that "[a]ny party who fails to comply with this rule *shall be deemed not to oppose such motion*." M.D. PA. L. R. 7.6 (emphasis added).

We similarly find no merit in Cruz's argument that the District Court's calendaring of an evidentiary hearing obviated the need for opposition papers. Although the District Court quickly granted the Government's scheduling request, the Government's ultimate goal was clear: it sought

18

an order authorizing the BOP to forcibly medicate Cruz. Cruz was on notice of the Government's ultimate request for relief, and he thus was or should have been aware of his obligation to oppose (or be deemed to support) it.

Cruz also argues that he was not obliged to present either evidence or argument at the *Sell* hearing. In some sense, he is correct. The Government bore the ultimate burden of proof under *Sell*, and Cruz was free to leave the Government to its proofs. But insofar as Cruz ignored the local rules and chose not to present argument at the conclusion of the *Sell* hearing, he made that choice at his peril. *E.g. Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 7 (1st Cir. 2007).

## C.

Notwithstanding his earlier arguments, Cruz argues that the Stay Brief preserved the same arguments that he now raises on appeal. We disagree. The Stay Brief was incapable of preserving the arguments that Cruz could have raised earlier but did not raise. *See Mick Haig Prods. E.K. v. Does 1-670*, 687 F.3d 649, 652 (5th Cir. 2012). That conclusion would hold true even if the Stay Brief was treated as favoring both a stay and reconsideration on the merits. *See United States v. Dupree*, 617 F.3d 724, 732-33 (3d Cir. 2010). And it "applies with added force" here, "where the timely raising of the issue would have permitted the parties to develop a factual record." *Gass v. V.I. Tel. Corp.*, 311 F.3d 237, 246 (3d Cir. 2002) (citation and internal quotation marks omitted).

19

## V.

We now address the *Sell*-specific standard of review and the substantive arguments that Cruz advances on appeal.

## A.

As noted above, the first *Sell* criterion concerns the Government's interest in forcibly medicating a defendant to restore his mental competency. To justify such action, "a court must find that *important* governmental interests are at stake." *Sell*, 539 U.S. at 180. A court's conclusions regarding the importance of the government's interest necessarily involve balancing the seriousness of the crimes at issue with case-specific "[s]pecial circumstances" that "may lessen the importance of that interest." *Id.* Examples of special circumstances include "the possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed[)]" and the likelihood, given "[t]he defendant's failure to take drugs voluntarily," that he will face "lengthy confinement in an institution for the mentally ill . . . that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Id.*

The *Sell* Court did not allocate burdens of proof or establish standards for appellate review for any of the four *Sell* criteria. Thus, we addressed those issues for the first time in *Grape*, and we concluded that: (1) the first *Sell* criterion is a question of law subject to plenary review; (2) the

20

second, third, and fourth *Sell* criteria are questions of fact that are subject to clear error review; and (3) "the Government bears the burden of proof on factual questions by clear and convincing evidence." 549 F.3d at 598-99.[5] Our discussion of case-specific special circumstances in that case was limited both by and to the arguments raised by the parties.

Since *Grape* was issued, at least two other federal appellate courts have further refined the burdens of proof and standard of review that apply to the first *Sell* criterion. First, the Court of Appeals for the Sixth Circuit announced a burden-shifting standard that recognizes the defendant's interest in bringing special circumstances to light. *See United States v. Mikulich*, 732 F.3d 692, 699 (6th Cir. 2013) ("While the ultimate burden of proving an important interest . . . remains with the Government, . . . the defendant [must] demonstrate that the special circumstances of his case undermine the Government's interest . . . ."). Shortly thereafter, the Court of Appeals for the D.C. Circuit clarified the related standard of review, ruling that it would "review *de novo* the District Court's conclusion that the Government has an important interest" but qualifying that "[t]o the extent that the District Court's determination under the first prong of *Sell* depends on findings of fact," it would "review those findings

---

[5] Those conclusions followed the trends set by the majority of federal appellate courts. When *Grape* was decided, the federal appellate courts that had reviewed the first *Sell* criterion agreed that it was a question of law subject to plenary review. *See Grape*, 549 F.3d at 598 & n.7 (surveying cases).

under a clear-error standard." *Dillon*, 738 F.3d at 291 (citations omitted).

Insofar as the *Grape* court discussed the first *Sell* criterion, it had little reason to consider it as a mixed question of both law and fact, expound upon the related standards of review, or address a shifting allocation of the burdens of proof. There was no dispute in that case that the defendant had been incarcerated for three-and-a-half years and faced mandatory minimum sentences of ten and fifteen years. Further, the facts of that case led the Court to "decline to reach whether [the defendant's] potential for indefinite civil confinement on the facts prior to his *Harper* medication would have sufficed under the first *Sell* factor to overcome the Government's stated interest." *Grape*, 549 F.3d at 603 n.10.[6]

We will thus adopt both the *Mikulich* burden-shifting standard and the mixed standard of review set forth in *Dillon*. Such adoption builds on the standard set forth by the *Grape* court and clarifies the extent to which defendants bear responsibility for proving the existence of special circumstances—circumstances recognized by the Supreme Court as inherently fact-specific. *See Sell*, 539 U.S. at 180 ("Courts . . . must consider the facts of the individual case in evaluating the Government's interest . . . .").

---

[6] Admittedly, the *Grape* court discussed the likelihood of civil confinement. But given the clear statement that it would not reach that issue, its related commentary is best characterized as *obiter dicta*.

22

**B.**

Cruz earlier conceded, in the Stay Brief, that "the government has an interest in sentencing a convicted defendant." (Supplemental App. 9.) Similarly, he recognizes on appeal that "there is a punishment interest that has some import." (Appellant Br. at 8.) But he now raises four related arguments that we must address. First, he argues that the Government does not and cannot have an important interest in restoring a defendant's mental competency to proceed with sentencing. In that sense, he distinguishes his case from *Grape*, *Sell*, and others where the Government's interest arose pre-trial. He next argues that the offenses for which he was convicted—i.e., Count II and Count III, which were each a violation of 18 U.S.C. § 115—are not "serious" offenses that might justify the Government's interest. Finally, he argues that the District Court erred when it considered the importance of the Government's interest by reference to the Guidelines range in the PSR and, more generally, to the PSR itself.[7]

**1. The Government Can Have an Important Interest in Restoring a Defendant's Mental Competency and Rendering Him Fit to Proceed with Sentencing**

In 2006, the Court of Appeals for the Sixth Circuit stated that it "appear[ed] yet unresolved whether the *Sell*

---

[7] Certain other arguments that Cruz raises for the first time in the Reply Brief will not be addressed. *See, e.g.*, *United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005).

23

principles permit the Government to involuntarily medicate a defendant for the purpose of rendering him competent to be *sentenced*," noting that the *Sell* principles had to that point only been applied "where the Government's purpose in medicating a defendant is to render him '*competent to stand trial*.'" *Baldovinos*, 434 F.3d at 241 n.7 (quoting *Sell*, 539 U.S. at 181). On that basis, Cruz argues on appeal that the Government lacks an important interest in restoring his mental competency to render him fit to proceed with sentencing. He seeks to distinguish this case from *Grape*, *Sell*, and others like it, where the *Sell* proceedings took place pre-trial.

Since *Baldovinos* was decided, only one court has considered whether the Government may have such an interest.[8] In 2006, in *United States v. Wood*, the District Court for the Eastern District of Virginia affirmatively answered that question. *See Wood*, 459 F. Supp. 2d at 456-60. In effect, the *Wood* court reached the same conclusion

---

[8] At oral argument, Cruz directed our attention to a second case, *United States v. Perez-Rubalcava*, No. 03-20018, 2008 WL 4601024, at *2 (N.D. Cal. Oct. 15, 2008). However, because the parties in that case agreed that the defendant "ha[d] already been in custody for a period of time nearly as long as the time for which he would likely have been sentenced if competent," that court did not have occasion to reach the questions presented here. *See id.* (noting that the Government "ha[d] in large part obtained the deterrence and other goals of a criminal conviction and sentence").

that the Government urges here: it held that the Government has an important interest in restoring a defendant's mental competency for sentencing because it has a legitimate interest in punishing those who have committed crimes. *See id.* at 458 ("[T]he sentence a defendant receives should accurately reflect the real nature of his offense, and should be tailored to the defendant's circumstances."); *id.* at 459 ("[T]here is a very important, legislatively articulated, governmental interest in achieving fair, reasonable and non-disparate sentences for similarly situated defendants who have engaged in similar conduct.").

The *Wood* court's holding rests on its analysis of the Sentencing Reform Act of 1984 ("the Sentencing Act"), the Sentencing Guidelines, and *United States v. Booker*, 543 U.S. 220 (2005), where the Supreme Court discussed governmental sentencing interests. *See id.* at 458-59. It found in pertinent part that *Booker* "made clear that the Government has an important interest in enforcing" both the Sentencing Act and Sentencing Guidelines. *Id.* It thus concluded that the Government has an important interest in "[r]easonable, constitutionally acceptable measures that help achieve that interest," including, importantly, "[t]he forcible administration of medication to restore competence for sentencing." *Id.* at 459.

Although the *Wood* court's decision does not bind this Court, its reasoning is highly persuasive. As that court recognized, in *Booker* the Supreme Court highlighted governmental interests that are inherent in sentencing proceedings. It repeatedly emphasized that the sentencing

25

scheme put in place by the Sentencing Act and Sentencing Guidelines "diminishes sentencing disparity" and "move[s] the sentencing system in the direction of increased uniformity." *Booker*, 543 U.S. at 250, 253. It also repeatedly emphasized that sentencing uniformity depends in critical part on the relationship between punishment and "the *real conduct* that underlies the crime of conviction." *Id.* at 250; *see id.* at 251 ("Judges have long looked to real conduct when sentencing," and often rely on "a presentence report, prepared by a probation officer, for information (often unavailable until *after* the trial) relevant to the manner in which the convicted offender committed the crime of conviction."); *id.* at 253-54 ("[I]ncreased uniformity . . . does not consist simply of similar sentences for those convicted of violations of the same statute . . . . It consists, more importantly, of similar relationships between sentences and real conduct, relationships that Congress' [sic] sentencing statues helped to advance[.]").

The Government cannot achieve the sort of uniformity contemplated in *Booker* without formal sentencing proceedings. A criminal defendant enjoys the right to allocute at sentencing, and he also enjoys the right to object to the PSR, to argue for favorable sentencing variances and downward departures from the Sentencing Guidelines, and to oppose any arguments favoring upward variances or departures from the Guidelines. Those rights, which to a great degree reflect the defendant's "real conduct," *id.* at 250, necessarily require the defendant to both actively participate in sentencing proceedings and inform his attorney's actions. Because an incompetent defendant is presumed unable to take

26

those actions, the Government maintains an important interest in restoring his mental competency and enabling him to do so.

Cruz here raises two arguments that the *Wood* court appears not to have had occasion to address. First, he argues that the Government's interest in forcibly medicating him to restore his competency for sentencing is undercut by its ability to seek a provisional sentence under 18 U.S.C. § 4244, whereby "in lieu of being sentenced to imprisonment" he would "be committed to a suitable facility for care and treatment" until he either "recovered from his mental disease or defect" or had been confined for "the maximum term authorized by law for the offense for which [he] was found guilty." 18 U.S.C. § 4244(d), (e). He also argues that the Government's interest in restoring his competency for sentencing is less than the interest recognized in *Sell*, contending that the Supreme Court placed particular emphasis on the pre-trial nature of the proceedings when it announced that "it may be difficult or impossible to try a defendant who regains competence after years of commitment during which memories may fade or evidence may be lost." *Sell*, 539 U.S. at 180. But neither argument carries significant weight. Cruz would have this Court parse sentencing proceedings from the substantive trial proceedings to which they are inexorably linked. This Court, like the *Wood* court, will reject that invitation. "If the sentencing phase of a federal criminal prosecution is not quite a 'tail which wags the dog of the substantive offense,' *McMillan v. Pennsylvania*, 477 U.S. 79, 88[] (1986), it is nonetheless a critical step in the criminal justice process that Congress designed." *Wood*, 459 F. Supp. 2d at 459.

27

Insofar as Cruz argues that provisional sentencing under § 4244 undermines the Government's important interest in restoring his competency for sentencing, he appears to ignore important language from the Supreme Court's opinion in *Sell*. There, the Supreme Court noted that the possibility of civil confinement "affects, but does not totally undermine, the strength of the need for *prosecution*." 539 U.S. at 180 (emphasis added). And it appears axiomatic that sentencing is an integral part of prosecution:

> When people speak of prosecutions, they usually mean a proceeding that is under way in which guilt is to be determined. In ordinary usage, sentencing is not part of the prosecution, but occurs after the prosecution has concluded. . . [However, r]ather than using terms in their everyday sense, (t)he law uses familiar legal terms in their familiar legal sense. The term 'prosecution' clearly imports a beginning and an end.
> . . . Final judgment in a criminal case means sentence. The sentence is the judgment. In the legal sense, a prosecution terminates only when sentence is imposed.

*Bradley v. United States*, 410 U.S. 605, 608 (1973) (defining "prosecution" within meaning ascribed by savings clause of Section 1103(a) of the Comprehensive Drug Abuse

28

Prevention and Control Act of 1970).[9] Indeed, it is hard to imagine prosecution without sentencing. Such a scheme would turn criminal convictions into little more than paper tigers. *See United States v. Petty*, 982 F.2d 1365, 1371 (9th Cir. 1993) (Noonan, J., dissenting on other grounds) ("To deny that the sentencing process is part of a criminal prosecution is to cut out the guts of criminal prosecution as it is conducted in our courts.").

Furthermore, insofar as Cruz argues that the Supreme Court's holding in *Sell* should be limited to the proceedings in

---

[9] Several cases support this conclusion. *See Gardner v. Florida*, 430 U.S. 349, 358 (1977) (concluding in context of Sixth Amendment that "sentencing is a critical stage of the criminal proceedings at which [a defendant] is entitled to the effective assistance of counsel"); *Bradley*, 410 U.S. at 611 ("As we have said, sentencing is part of the prosecution."); *United States v. Thompson*, 713 F.3d 388, 394 (8th Cir. 2013) (holding in First Amendment context that "[s]entencing may . . . be viewed as within the scope of the criminal trial itself" (citation omitted)); *United States v. Smith*, 354 F.3d 171, 175 (2d Cir. 2003) ("[S]entencing is an integral part of 'prosecution' of the accused, as that term is used in" the General Saving Statute, 1 U.S.C. § 109"); *United States v. Wells*, 154 F.3d 412, 414 (7th Cir. 1998) (in affirming conviction for obstruction of justice, stating unequivocally that "sentencing is part of the prosecution"); *United States v. Green*, 680 F.2d 183, 191 (D.C. Cir. 1982) (Bazelon, J., dissenting on other grounds) ("Sentencing is the most important part of the typical criminal trial.").

which a defendant's guilt may be determined, he ignores important procedural aspects of the sentencing phase of trial. As noted above, the Supreme Court stated its concern in *Sell* that "memories may fade or evidence may be lost." 539 U.S. at 180. That concern applies with equal force to both the jury's determination of a defendant's guilt and the court's sentencing determinations. Whereas the Court announced in *Sell* that "it may be difficult or impossible to *try* a defendant who regains competence after years of commitment during which memories may fade and evidence may be lost," *id.* (emphasis added), we recognize that it may be difficult or impossible to *sentence* a defendant who regains competence after years of commitment for substantially the same reasons. *Cf. Booker*, 543 U.S. at 251 (noting that "judges have long relied upon a presentence report . . . for information (often unavailable until *after* the trial)" for sentencing purposes).

## 2. The Offenses at Issue Were "Serious" and They Thus Justified the Government's Interest

Cruz next argues that the crimes for which he was convicted—Count II and Count III, violations of 18 U.S.C. § 115—were not as serious as the crimes at issue in *Sell* and *Grape*, and he appears to contend that the seriousness of his crimes undermines the Government's interest in restoring his competency for sentencing. The seriousness of a defendant's crimes is, of course, the yardstick against which the court will measure the governmental interests that are at stake. And serious crimes may be committed against either persons or property because "[i]n both instances the Government seeks

30

to protect through application of the criminal law the basic need for human security." 539 U.S. at 180.

Because this Court has not yet promulgated a test to determine the seriousness of a crime, the District Court gauged the seriousness of Cruz's crimes by reference to both the statutory maximum sentence associated with those offenses and the likely Guidelines range that was set forth in the PSR. It concluded that, under either rubric, his crimes were serious. We agree, and, as in *Grape*, need not decide here whether the seriousness of an offense should be measured against either the statutory maximum associated with an offense or the likely Guidelines range.

Cruz has not argued by reference to the applicable statutory maximum that his crimes are not serious. Indeed, it appears that he cannot. At least two other federal appellate courts have determined that the offense at issue here, a violation of 18 U.S.C. § 115, is a serious crime because it carries a maximum sentence of ten years. *See United States v. Palmer*, 507 F.3d 300, 301, 303-04 (5th Cir. 2007); *United States v. Evans*, 404 F.3d 227, 238 (4th Cir. 2005) (concluding that violation of 18 U.S.C. § 115 is a serious crime "under any reasonable standard").

His argument on the seriousness of his crimes as gauged by the Guidelines range in the PSR is similarly unavailing. In *United States v. Gillenwater*, the defendant was charged with violations of 18 U.S.C. §§ 875 (transmitting threatening interstate communications) and 876 (transmitting threatening communications by mail), and the "likely

31

Guidelines range [w]as 33 to 41 months." 749 F.3d 1094, 1101 (9th Cir. 2014). That Guidelines range is less than that at issue here.[10] Retired Supreme Court Justice Sandra Day O'Connor, writing for the Ninth Circuit Court of Appeals, considered the likely Guidelines range and concluded that the charged offenses were "serious enough to establish an important governmental interest in [the defendant's] prosecution." *Id.* She noted that the defendant stood "accused of making lurid and distressing threats against a bevy of government officials and employees" and she thus reasoned that through prosecution the Government sought "'to protect through application of the criminal law the basic human need for security' . . . [and] the very integrity of our system of government." *Id.* (quoting *Sell*, 539 U.S. at 180).

---

[10] Cruz takes issue with the likely Guidelines range that was presented in the PSR, which was premised on a career offender enhancement. It appears, however, that the legal arguments relating to that issue are foreclosed by our recent decision in *United States v. Marrero*, 743 F.3d 389 (2014).

In any event, the Guidelines range urged by Cruz—i.e., 51 to 63 months—is still greater than that at issue in *Gillenwater*. It is thus a difference without distinction. Even if we accepted the Guidelines range urged by Cruz, then we would conclude that the crimes at issue are serious. *See Gillenwater*, 749 F.3d at 1101 (concluding that threats of violence, directed against federal officials, were serious where likely Guidelines range called for only thirty three to forty-one months' imprisonment).

The crimes at issue here are no less "lurid and distressing" than those at issue in *Gillenwater*. There, the defendant was charged with sending violent and graphically descriptive threats to officials from the Occupational Safety and Health Administration and the Department of Labor. *See id.* at 1097-98. Here, Cruz repeatedly threatened officials from the SSA and Federal Protective Service ("FPS"). He yelled at several SSA officials that they were "going to need toe tags" and told an FPS official that he would "take [his] ticket book, take [his] gun, take [his] doughnut and beat [his] ass." In another, particularly graphic encounter with an FPS official, he stated that "[t]here [sic] gonna be a war about this," explaining that you should be concerned about yourself. . . . If I'm gonna tell you I'm gonna kill you, I ain't gonna tell you I'm gonna kill you, I'm gonna swing at you, all I gotta do is hit you one time," and inviting the official to "come see me in person so we can talk and see whatever, so I can see what I'm talking to. Give me a target, you have one." *United States v. Cruz*, No. 11-242, 2012 WL 3027809, at *1 (M.D. Pa. July 24, 2012) (citations and quotation marks omitted).

Those statements demonstrate the reasonableness of concluding that the Government's interest in preserving "human security" is as great here as it was in both *Sell* and *Gillenwater*. *See Sell*, 539 U.S. at 180 (recognizing the Government's need "to protect through application of the criminal law the basic human need for security"); *Gillenwater*, 749 F.3d at 1101 (recognizing the Government's

33

need "to protect the very integrity of our system of government").[11]

### 3. As a General Matter, the District Court Did Not Commit Reversible Plain Error When it Considered and Relied on the PSR

Cruz next argues that the District Court erred when it considered the Guidelines range appearing in the PSR

---

[11] In any event, the District Court's consideration of the seriousness of Cruz's offenses by reference to the likely Guidelines range cannot constitute plain error. As noted above, we have yet to decide whether the seriousness of an offense should be measured against mandatory minimum sentences or likely Guidelines ranges. Other circuit courts are split on that issue. *See Grape*, 549 F.3d at 600; *see also Dillon*, 738 F.3d at 292 (recognizing the circuit split as recently as December of 2013). Under those circumstances, there could be no plain error. *See, e.g.*, *United States v. Keller*, 666 F.3d 103, 109 & n.7 (3d Cir. 2011).

Furthermore, the error that Cruz would have us assign could not have affected his substantial rights. Although the District Court concluded that Cruz's crimes were serious by reference to the likely Guidelines range, it reached the same conclusion upon its separate and alternative analysis of the mandatory maximum sentence associated with his crimes. Because it consideration of the likely Guidelines range ultimately did not affect the outcome of his *Sell* proceeding, Cruz was not and could not be prejudiced by it. *See United States v. Stevens*, 223 F.3d 239, 242 (3d Cir. 2000).

because that range did not account for Cruz's mental health status, which could potentially serve as a basis for a downward departure or variance. However, because Cruz raises this argument for the first time in the Reply Brief, we will not consider it. Instead, we will deem it, like the other arguments that were raised for the first time in the Reply Brief, to be waived. *See Pelullo*, 399 F.3d at 222.

## C.

Lastly, Cruz argues that the District Court erred when it concluded that the Government's interest was not undermined by the likelihood that Cruz will be civilly committed in the future. As discussed above, that circumstance involves a fact-specific inquiry, and , accordingly, this Court should review the District Court's related legal conclusions *de novo* and its factfinding for clear error. *See Dillon*, 738 F.3d at 291.

The District Court considered the likelihood that Cruz would be civilly committed in the future under both federal and state civil commitment statutes and concluded that it was, at best, unclear. (*See* App. 9-10.) In pertinent part, it explained:

> Under 18 U.S.C. § 4246(d), the court would need to find that Cruz is suffering from a mental disease or defect that would create "a substantial risk of bodily injury to another person or serious damage to property of another" if released. Similarly, the state civil commitment statute, 50 [Pa.C.S.] § 7301,

35

provides for involuntary emergency examination and treatment of people who are "severely mentally disabled and in need of immediate treatment." Under the statute, a person is severely mentally disabled when, as a result of mental illness, "he poses a clear and present danger of harm to others or to himself." 50 [Pa.C.S.] § 7301(a). A "clear and present danger of harm" to others may be "demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm." 50 [Pa.C.S.] § 7301(b).

The May 2013 evaluation explicitly states that Cruz has not posed a threat to himself or others while housed at FMC-Butner and does not pose a risk of committing serious harm to others. Cruz was convicted of two counts of threatening federal law enforcement officers, but there is no indication that he committed explicit acts in furtherance of those threats. On the other hand, the pre-sentence investigation report indicates that Cruz has a lengthy criminal history involving numerous acts of violence and threats of violence and an extensive history of mental health treatment, including involuntary commitments. Entries from the [BOP's] Psychology Data System, dated June 20, 2013 to October 10, 2013, indicate that Cruz has continued to threaten violence against others. Several entries indicate

36

> that the potential for Cruz to cause harm to others is moderate or high.

(*Id.*) On those facts, it concluded that "[u]ncertainty surrounding the issue of whether Cruz is likely to be civilly committed does not materially diminish, and it clearly does not undermine, the government's interest in sentencing Cruz." (App. 10.)

Following close review of the record, we will not disturb the District Court's factfinding because it is not clearly erroneous. Its recitation of the facts, including those related to the May 2013 evaluation, Cruz's history of mental health issues, and his history of violence and threats of violence, is well-supported by the record. Thus, we find no error in the District Court's conclusion that it was uncertain whether Cruz would in the future meet the factual prerequisites for civil commitment under either 18 U.S.C. § 4246 or 50 Pa.C.S. § 4244. The stark contrast between the May 2013 evaluation and Cruz's history of both threats of violence and actual violence fairly led the District Court to reach that conclusion. Further, we find no plain error in the District Court's conclusion that such uncertainty neither materially diminished or undermined the Government's interest in restoring his competency for sentencing. *Cf. Mikulich*, 732 F.3d at 697.

Furthermore, under plain error review, Cruz has failed to demonstrate that he was prejudiced by any alleged error in either the District Court's factfinding or ultimate conclusion that uncertainty surrounded the likelihood of future civil

commitment. Although eligibility for civil commitment may "diminish[] the risks that ordinarily attach to freeing without punishment one who has committed a serious crime," *Sell*, 539 U.S. at 180, and thereby lessen the Government's interest in restoring Cruz's competency, *see Gillenwater*, 749 F.3d at 1101, the uncertainty found by the District Court here would undoubtedly reduce the amount by which this circumstance would lessen the Government's interest.

## VI.

For the forgoing reasons, we will affirm the order entered by the District Court pursuant to *Sell v. United States*, 539 U.S. 166 (2003) on October 24, 2013.