NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-2210
_____

UNITED STATES OF AMERICA

v.

ENRIQUE SALDANA,
                              Appellant
_____

On Appeal from the District Court
of the Virgin Islands
(D.C. Criminal No. 3-09-cr-00032)
District Judge: Honorable Curtis V. Gomez
_____

Argued: May 2, 2017
_____

Before:  GREENAWAY, JR., SHWARTZ, and FUENTES, *Circuit Judges*.

(Opinion Filed: December 20, 2017)

Omodare B. Jupiter *[ARGUED]*
Office of Federal Public Defender
4094 Diamond Ruby
Suite 5
Christiansted, St. Croix, VI 00820

*Counsel for Appellant*

Nelson L. Jones
David W. White *[ARGUED]*
Office of United States Attorney
5500 Veterans Drive, Suite 260
United States Courthouse
St. Thomas, VI 00802

*Counsel for Appellee*

_____

OPINION[*]
_____

GREENAWAY, JR., *Circuit Judge*.

Appellant Enrique Saldana challenges a judgment revoking his supervised release

and resentencing him to eighteen months' imprisonment.  On appeal, he challenges: (1)

the sufficiency of evidence supporting a supervised release revocation; (2) the

classification of one of his supervised release violations; (3) the District Court's denial of

his motion to continue the supervised release revocation hearing; (4) the District Court's

decision to reopen the revocation hearing after closing arguments; and (5) the District

Court's decision to order the government to produce additional witnesses for

examination.  For the reasons that follow, we will affirm.

I.    **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

A.    **Saldana on Supervised Release**

In January 2010, a federal jury convicted Saldana of extortion and conspiracy to

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

commit extortion, and, in March 2011, sentenced him to forty-one months' imprisonment and three years of supervised release. He began to serve his term of supervised release in February 2014.

In the early morning of May 2, 2014, Saldana rushed his incapacitated, estranged wife, Jeanette Magras Saldana, to the hospital.[1] Hospital staff pronounced her dead shortly after her arrival. Police arrested Saldana for murder later that day. Territorial prosecutors charged Saldana with first degree murder, second degree murder, second degree assault, and third degree assault. Saldana's probation officer soon filed a petition to revoke supervised release, alleging that Saldana violated three conditions of supervised release: (1) committing another federal, state or local crime; (2) disobeying the instructions of the probation officer; and (3) failing to notify the probation officer at least 10 days prior to any change in residence.

**B.      The Supervised Release Revocation Hearing**

The supervised release revocation hearing, originally scheduled for February 25, 2015, began on April 21, 2016 and ended on April 22, 2016.

**1.      Saldana's Final Motion for a Continuance**

On April 18, 2016, three days before the revocation hearing, the government provided an additional 118 pages of discovery to the defense. This, in part, prompted

---

[1] To avoid confusion, we refer to Enrique Saldana as "Saldana" and Jeannette Magras Saldana as "Magras Saldana."

3

Saldana to move for a continuance.[2]  But the District Court did not rule on the motion before the morning of the revocation hearing, so the defense counsel renewed his motion at the beginning of the revocation hearing.  The defense counsel raised three grounds for a continuance: (1) the defense's expert witness was running late due to a flight delay; (2) the timing of the government's discovery disclosure was egregious; and (3) the discovery disclosure contained a police report that the defense claimed the government's expert witness relied on in forming his opinion.  After hearing the parties' arguments on each ground, the District Court denied the motion, ordered the government to put its expert on last to account for the delayed arrival of the defense's expert, and then moved along to witness testimony.

### 2.    Initial Witness Testimony

According to the testimony, Magras Saldana hosted a gathering at her house the night before she died.[3]  Her cousin, Odette Magras; Odette's boyfriend, Corey Isaac; and Saldana attended.  Magras and Isaac left around midnight.  Three people remained in the house: Magras Saldana, Saldana, and their daughter, who was sound asleep.

---

[2] The District Court granted multiple motions from Saldana and the government to continue the revocation hearing.

[3] Detective Dwight Griffith testified to the details of the gathering at Magras Saldana's residence.  In May 2014, Griffith was assigned to the Major Crimes Unit of the Virgin Islands Police Department and took part in the investigation of her death.

The testimony established that prior to a window of time of about six hours, the last person seen with Magras Saldana was Saldana. During this window of time, she suffered abrasions and contusions about her body and ingested a near-lethal dosage of diphenhydramine (commonly known by the brand name Benadryl). At the end of this window of time, Saldana drove her to the hospital, where she was pronounced dead shortly after arrival.[4] The government's theory was that Saldana was responsible, based on the autopsy evidence and that he was the last person seen with her. The defense's theory was that she died accidentally.

The government supported its theory with the expert testimony of Dr. Francisco Landron, the medical examiner that performed Magras Saldana's autopsy. He testified that the cause of death was acute Benadryl intoxication. The manner of death: homicide.[5] The toxicology report that Dr. Landron relied on indicated, in his opinion, that Magras Saldana ingested a lethal concentration of diphenhydramine. Magras Saldana's body temperature suggested the actual time of death was "about two hours prior to arriving at the hospital." App. 272. But the "most significant finding[s]," according to Dr. Landron, were the "multiple injuries, multiple contusions and . . . abrasions that were distributed all

---

[4] Officer Bernard Burke testified to providing Saldana a police escort to the hospital. Nurse Robin McGonigle testified to the details of the scene at the hospital.

[5] Dr. Landron reached this conclusion "based on the circumstances surrounding the death, . . . the autopsy findings[,] and . . . the toxicology report." App. 273. In addition to Dr. Landron's testimony, the toxicology report, autopsy report, and other documents were admitted into evidence.

over [her] body." App. 267. He explained that, generally, contusions are "the result of blunt force trauma," caused by a punch, kick, being struck by an object, or a fall, and, specifically, Magras Saldana's contusions "can be considered defense-type" injuries. App. 268, 319. However, Dr. Landron said that these injuries were not the cause of death.

The defense supported its theory with the testimony of Dr. Joseph Pestaner, a forensic pathologist.[6] He agreed that Magras Saldana died of a drug overdose, but concluded that alcohol and alprazolam contributed to the cause of death. Dr. Pestaner said that the blunt force trauma injuries Magras Saldana sustained were consistent with falling. On cross-examination, however, he agreed with the common-sense proposition that if one falls forward, there would be no injuries on their back (Magras Saldana had blunt force injuries on her back).

### 3. Closing Arguments and Initial Findings

Closing arguments occurred the same day. After closing arguments, the District Court announced its findings on two of the three alleged violations. First, the District Court found there was insufficient evidence that Saldana changed his residence without notifying his probation officer. Then, the District Court found sufficient evidence that Saldana violated his probation officer's specific instruction to not stay the night at Magras Saldana's residence.

---

[6] Dr. Pestaner was the defense's only witness at the revocation hearing.

As for the third alleged violation, the District Court stated that it would "review the record further" and "reconvene at 2:30" the next day, at which point the Court would "allow the parties to be heard, to the extent they can find any other evidence, in the record, one, as to when the contusions occurred; and two, the effect, if any, if there is no record evidence as to when the contusions occurred." App. 440–41.

### 4. Additional Witness Testimony, the District Court's Final Finding, and Sentencing

That night, the District Court ordered the government to produce Magras and Isaac for testimony the next day because it needed to "clarify testimony, and . . . matters in issue in th[e] case." App. 462.[7] The District Court questioned Magras and Isaac about Magras Saldana's attire and whether there were any bruises visible on her person; they said no bruises were present. The District Court also asked who was present at the residence when they left; they said Saldana, Magras Saldana, and the Saldanas' daughter. After the District Court finished asking questions, it invited the parties to question the witnesses. The government briefly questioned Magras but declined to question Isaac. The defense declined to question either witness.

The District Court then announced its holding on the remaining alleged violation: there was sufficient evidence that Saldana committed third degree assault, in violation of 14 V.I. Code Ann. § 297(a)(4). The District Court based its decision on the timing of

---

[7] The defense objected; the District Court overruled the objection.

7

events, the bruises, the witness testimony, and the documentary evidence. The District

Court also observed that third degree assault "certainly requires some act of violence on

the part of another," and concluded that is what happened in the instant case. App. 505.

Finally, the District Court classified Saldana's violations: disobeying the

instructions of the probation officer and the violation of territorial law constituted Grade

C and Grade A violations, respectively. As a result, the District Court imposed a

sentence of eighteen months' imprisonment, eighteen months' supervised release, and

four hundred hours of community service. Saldana filed this timely appeal.

## II.  JURISDICTION

The District Court had jurisdiction pursuant to 48 U.S.C. § 1612 and 18 U.S.C.

§§ 3231 and 3583(e). We have appellate jurisdiction pursuant to 28 U.S.C. § 1291 and

18 U.S.C. § 3742(a).

## III.  ANALYSIS

Saldana raises several challenges on appeal. For the reasons that follow, we

conclude that they are meritless.[8]

### A.  Sufficiency of Evidence as to Third Degree Assault

We turn first to Saldana's challenge to the sufficiency of evidence supporting the

determination that he committed third degree assault. "A district court must find 'by a

---

[8] Saldana does not challenge the District Court's findings as to the Grade C violation.

8

preponderance of the evidence that the defendant violated a condition of supervised release . . . .'" *United States v. Maloney*, 513 F.3d 350, 354 (3d Cir. 2008) (quoting 18 U.S.C. § 3583(e)(3)). "The District Court's decision to revoke supervised release is reviewed for abuse of discretion." *Id.* Factual findings are reviewed for clear error, and legal issues are reviewed de novo. *Id.*

The relevant variation[9] of third degree assault has two elements: (1) "assault[ing] another"; and (2) "inflict[ing] serious bodily injury upon the person assaulted." 14 V.I. Code Ann. § 297(a)(4). An individual can commit "assault" in one of two ways. The first way is by attempting to "use[] any unlawful violence upon the person of another with intent to injure [that person]." *Id.* §§ 291, 292 (defining assault and battery). The second way is by making "a threatening gesture showing in itself an immediate intention coupled with an ability to" use unlawful violence. *Id.* Third degree assault "does not . . . require proof of intent to do serious bodily injury, but simply that serious bodily injury resulted from a defendant's conduct." *People v. Lima*, 57 V.I. 118, 126 (V.I. Super. Ct. 2012) (emphasis omitted).

In the context of a revocation hearing, the District Court is only required to find a violation of § 297(a)(4) by a preponderance of evidence, not beyond a reasonable doubt.

---

[9] The Virgin Islands Code provides four definitions of assault in the third degree. *See* 14 V.I. Code Ann. § 297(a)(1)-(4). The District Court defined assault in the third degree as an assault that "inflicts serious bodily injury." App. 480. This definition corresponds to the definition of assault in the third degree found in § 297(a)(4). Therefore, the District Court apparently concluded that Saldana violated § 297(a)(4), as opposed to the other provisions defining assault in the third degree.

*See* 18 U.S.C. § 3583(e)(3). Under the preponderance of evidence standard, "it is not necessary that the probationer be adjudged guilty of a crime, but only that the court be reasonably satisfied that he has violated one of the conditions." *United States v. Poellnitz*, 372 F.3d 562, 566 (3d Cir. 2004). Saldana ignores this standard, as evidenced by his reliance on *Tyson v. People*, 59 V.I. 539, 548 (Sup. Ct. V.I. 2013), a case where the Supreme Court of the Virgin Islands held, under a beyond a reasonable doubt standard, that the sparse testimony of one witness did not sufficiently link the defendant to the alleged assault to support a third degree assault conviction.

The following details from the revocation hearing record support the District Court's determination: when Magras and Isaac last saw Magras Saldana alive, she did not have any visible bruises or contusions; when Magras and Isaac left the party, the only people in the house were Saldana, Magras Saldana, and their daughter, who was asleep; and six hours later, Magras Saldana was incapacitated (perhaps dead) and covered in bruises and contusions that were consistent with defensive injuries. This testimony, along with other circumstantial evidence introduced at the revocation hearing, is sufficient to support a finding that Saldana committed third degree assault.

**B.      Saldana's Conduct (Third Degree Assault) Constituted a Grade A Violation**

Next, we turn to Saldana's challenge to the District Court's classification of his conduct as a Grade A violation. "We review a District Court's interpretation of the Sentencing Guidelines de novo and its application of the Guidelines to the facts for clear

10

error." *United States v. Woronowicz*, 744 F.3d 848, 850 (3d Cir. 2014). When a defendant violates the conditions of his supervised release, the district court will classify the defendant's conduct as either a Grade A, Grade B, or Grade C violation, as defined in the Guidelines. U.S. Sentencing Guidelines Manual § 7B1.1 (U.S. Sentencing Comm'n 2017) [hereinafter Guidelines Manual].

Here, the distinction between the conduct that encompasses Grade A and Grade B violations is the essence of Saldana's challenge. Grade A violations encompass "conduct constituting . . . a federal, state, or local offense punishable by a term of imprisonment exceeding one year that . . . is a crime of violence." *Id.* § 7B1.1(a)(1). Grade B violations encompass "conduct constituting any other federal, state, or local offense punishable by a term of imprisonment exceeding one year." *Id.* § 7B1.1(a)(2). The difference between the two grades is whether the conduct constitutes a "crime of violence."

Section 7B1.1 defines a "crime of violence" by reference to § 4B1.2, a provision that is applicable in the career offender context. *Id.* § 7B1.1 cmt. n.2. Section 4B1.2 defines a crime of violence as "any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that . . . has as an element the use, attempted use, or threatened use of physical force against the person of another." *Id.* § 4B1.2(a). "[T]he phrase 'physical force' means *violent* force—that is, force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010).

11

Saldana argues that, assuming his conduct constituted third degree assault, this offense did not constitute a Grade A violation because, under the categorical approach, third degree assault is not a crime of violence. Generally, in the § 4B1.2 context, we apply the categorical approach to determine whether a defendant's conviction constitutes a crime of violence. *See, e.g.*, *United States v. Brown*, 765 F.3d 185, 188–89 (3d Cir. 2014). Under this approach, courts look "only to the statutory definitions of the . . . offense[], and not to the particular facts underlying th[e] conviction[]." *Taylor v. United States*, 495 U.S. 575, 600 (1990).

In the supervised release revocation context, the strict categorical approach does not apply because § 7B1.1 allows the district court to determine the grade of the violation based upon the defendant's actual conduct. *United States v. Carter*, 730 F.3d 187, 192 (3d Cir. 2013). After determining the offense the defendant's actual conduct constitutes, the district court must then apply the categorical approach's focus on the elements of the offense. This entails asking whether the offense "has the use or threat of physical force [against the person of another] as an element." *Brown*, 765 F.3d at 189 (alteration in original) (internal quotation marks omitted). As noted above, "physical force" refers to "force capable of causing physical pain or injury to another person." *Johnson*, 559 U.S. at 140.

Here, the District Court concluded that Saldana committed assault in the third degree under 14 V.I. Code Ann. § 297(a)(4), which requires that the assault "inflicts serious bodily injury upon the person assaulted." Because this offense, by definition,

12

requires that "serious bodily injury" result, it inevitably follows that this offense is one which requires force capable of causing physical pain or injury. *See Roberts v. Holder*, 745 F.3d 928, 930–31 (8th Cir. 2014) (per curiam) (concluding that third degree assault under Minnesota law constituted a crime of violence because the statute required the infliction of substantial bodily harm and therefore would ordinarily involve the intentional use of physical force). Accordingly, the District Court correctly concluded that assault in the third degree under Virgin Islands law is a crime of violence, and thus Saldana committed a Grade A supervised release violation.

### C. Motions for a Continuance

We now turn to Saldana's challenge to the District Court's decision to deny his motions for a continuance. We review the district court's denial of a continuance for abuse of discretion. *United States v. Adedoyin*, 369 F.3d 337, 341 (3d Cir. 2004). Whether a refusal to grant a continuance amounts to a due process violation depends on the "particular circumstances of each case." *United States v. Olfano*, 503 F.3d 240, 245–46 (3d Cir. 2007) (citing *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)). Courts should consider the following factors when presented with a motion for a continuance: "the efficient administration of criminal justice, the accused's rights, and the rights of other defendants whose trials may be delayed as a result of the continuance." *Id.* at 246. Additionally, the party challenging the denial of a continuance must prove that "the denial was arbitrary and it substantially impaired the defendant's opportunity to receive a fair [hearing]." *Id*.

13

Saldana claims the District Court erred twice. First, he argues that the revocation hearing should have been delayed until the disposition of his criminal trial, based on the following reasons:

(1) permitting the [defendant] to clear himself of the criminal charges with the likely result that the [supervised release] violation proceedings will not be held,

(2) avoiding the need to have the [defendant] testify in the [supervised release] violation proceeding as to matters which may prejudice him in the criminal case, [and]

(3) avoiding inconsistent findings in the [revocation] proceedings and the criminal case[.]

Appellant's Br. at 37 (quoting *United States v. Sackinger*, 537 F. Supp. 1245, 1250 (W.D.N.Y. 1982), *aff'd*, 704 F.2d 29 (2d Cir. 1983)).

Although the timing of the revocation hearing put Saldana in a position to make a difficult decision in deciding whether to testify at the revocation hearing, the timing did not constitute a constitutional violation. *See United States v. Babich*, 785 F.2d 415, 416–17 (3d Cir. 1986) (stating that Third Circuit precedent established "that the postponement of [a] revocation hearing . . . is not constitutionally required"); *Flint v. Mullen*, 499 F.2d 100, 105 (1st Cir. 1974) (holding where a state prisoner violated his deferred sentence agreement, it was not a violation of due process to hold the violation hearing before the criminal trial). We see no reason to believe that the refusal to continue the revocation

14

hearing until the criminal trial substantially impaired Saldana's opportunity to receive a fair hearing.[10]

The second error, according to Saldana, was the District Court's decision to begin the revocation hearing on the morning of April 21, 2016, despite Dr. Pestaner's flight delay and the government's discovery disclosure three days before the revocation hearing, which included a police report that allegedly implicated information that Dr. Landron relied on. We note at the outset that the District Court accommodated the defense by requiring Dr. Landron to testify at the end of the government's case in chief. Although Dr. Pestaner was unable to listen to all of the witness testimony, Saldana fails to explain how that substantially impaired his opportunity to receive a fair hearing. As for the discovery disclosure, the defense interviewed Dr. Landron and had the opportunity to explore his knowledge. Nothing suggests that Dr. Landron relied on the police report included in the discovery disclosure. We therefore conclude that the District Court did not abuse its discretion in refusing to continue the revocation hearing despite Dr. Pestaner's late arrival and the timing of the government's disclosure.

## D.     Reopening the Revocation Hearing

Next, we turn to Saldana's challenge to the District Court's decision to reopen the revocation hearing to examine Magras and Isaac. We review a district court's decision to

---

[10] Moreover, the refusal to continue the revocation hearing until the criminal trial had no impact on the District Court's finding of a Grade C violation.

reopen a proceeding after the government rests its case for abuse of discretion. *United States v. Coward*, 296 F.3d 176, 180 (3d Cir. 2002). "When faced with a motion to reopen, the district court's primary focus should be on whether the party opposing reopening would be prejudiced if reopening is permitted." *United States v. Kithcart* (*Kithcart II*), 218 F.3d 213, 220 (3d Cir. 2000). The court must also "consider the timeliness of the motion, the character of the testimony, and the effect of the granting of the motion." *Coward*, 296 F.3d at 181 (quoting *United States v. Blankenship*, 775 F.2d 735, 741 (6th Cir. 1985)).

Two problems plague Saldana's argument. First, Saldana presented evidence that necessitated reopening. The District Court offered a reasonable explanation, observing that it would be useful to hear the testimony of Magras and Isaac "in light of some of the questions that the Court had at the end of the [summations the day prior,] and in light of some of the hearsay that was presented . . . in video clips by the defense during examination of [other] witnesses." App. 445.[11]

Second, the additional testimony did not unfairly prejudice Saldana. Although he contends that "[a]llowing the court to reopen *sua sponte* is prejudicial," Appellant's Br. at

---

[11] The District Court's explanation thus provides a critical distinction between this case and *Kithcart II*, a case Saldana insists proves his point. In *Kithcart II*, this Court had already reversed the district court's denial of a motion to suppress because the police lacked probable cause to search the defendant. 218 F.3d at 215. On remand, the district court allowed the government to reopen the suppression hearing to present additional testimony. *Id.* When the case returned to this Court, we held that the district court erred by admitting additional evidence without the requisite explanation. *Id.* at 221.

16

45, it is not clear what exactly was unfairly prejudicial. Magras's and Isaac's testimony clarified what Detective Griffith said: no bruises were visible on Magras Saldana's body when Magras and Isaac departed from the gathering. Without the requisite prejudice, this claim fails.

### E. Ordering Government to Produce Witnesses and Examine the Witnesses

Finally, we turn to Saldana's challenge to the District Court's decision to order the government to produce Magras and Isaac for examination. The parties disagree on the appropriate standard of review, but we conclude that this claim fails under any standard.[12]

The revocation of supervised release "result[s] in a loss of liberty," therefore, it is subject to the "minimum requirements of due process." *United States v. Barnhart*, 980 F.2d 219, 222 (3d Cir. 1992) (internal quotation marks omitted). These minimum requirements include "a 'neutral and detached' hearing body." *Morrissey v. Brewer*, 408 U.S. 471, 489 (1972).

---

[12] Saldana calls for plenary review because he characterizes this claim as a procedural due process claim. Appellant's Br. at 45; *see also United States v. Dees*, 467 F.3d 847, 854 (3d Cir. 2006) ("We exercise plenary review over a due process claim."). Meanwhile, the government calls for plain error review, because, in its view, Saldana forfeited the claim. Appellee's Br. at 37; *see also United States v. Cruz*, 757 F.3d 372, 379 (3d Cir. 2014) (applying plain error review to forfeiture of a right). The government, alternatively, requests abuse of discretion review. Appellee's Br. at 37; *see also United States v. Adedoyin*, 369 F.3d 337, 342 (3d Cir. 2004) (applying abuse of discretion review to a district court's examination of a witness).

Saldana argues that, generally, a "judge is not a 'neutral and detached' hearing body if he decides what allegations to proceed on or how to proceed on them." Appellant's Br. at 49. Saldana then applies this purported rule to his case: the government proceeded on a theory that Saldana "murdered his wife by poisoning her," but the District Court "did not find that the government proved" that theory. Appellant's Br. at 49. Rather than "dismiss[] that count, the [D]istrict [C]ourt called its own witnesses after the government rested and found Mr. Saldana guilty of an offense the government never alleged." *Id.* In other words, the government placed all of its chips on the murder-by-poison theory and lost, but then the District Court stepped in to play the role of an advocate and presented an assault-by-blunt-force-trauma theory. We find this argument unpersuasive.

The government had to prove Saldana violated a federal, state, or local law by a preponderance of the evidence. This did not confine the government to proving a particular crime or theory, as Saldana suggests. We also observe that the government, in addition to attempting to prove a violation of law with a murder-by-poison theory, presented evidence to support an assault-by-blunt-force-trauma theory. In its closing argument, the government evoked the testimony "concerning the injuries [Magras] Saldana had on her person, concerning contusions to the head, torso, extremities, back, and that those injuries were consistent with blunt force trauma." App. 380.

Additionally, we conclude that the revocation hearing judge never abandoned his "proper role and assume[d] that of an advocate." *Adedoyin*, 369 F.3d at 342 (internal

18

quotation marks omitted).  In seeking to "clarify testimony, and . . . matters in issue in this case," App. 462, the revocation hearing judge elicited observations and did not impeach or discredit the witnesses.  *See* Fed. R. Evid. 614(a)-(b) (permitting a court to call witnesses on its own and examine witnesses); *Adedoyin*, 369 F.3d at 342 (stating that a district court may "interrogate witnesses," and noting that "the court is more than a 'mere umpire' of the proceedings"); *Moore v. United States*, 598 F.2d 439, 443 (5th Cir. 1979) (holding that the defendant had failed to prove that the court's questioning was improper where he relied on "the mere fact of judicial questioning" without identifying any "specific instances of biased interrogation"); *United States v. Stirone*, 311 F.2d 277, 279 (3d Cir. 1962) (observing that "[i]t is the right and duty of the judge to act in the interrogation of witnesses to the end that the truth emerge," therefore, "if the issues are obscured or the testimony misunderstood, [the judge] is entitled to and should interrogate witnesses to help render understandable such matters").  Accordingly, this claim fails.

## IV.  CONCLUSION

For the reasons set forth above, we will affirm the District Court's order.