In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-3406

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

NORMAN W. BREEDLOVE,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 10 CR 50078-5 — **Fredrick J. Kapala**, *Judge.*

ARGUED APRIL 10, 2014 — DECIDED JUNE 30, 2014

Before CUDAHY and EASTERBROOK, *Circuit Judges*, and
LAWRENCE, *District Judge*.[*]

CUDAHY, *Circuit Judge*. The case before us raises the question whether a presentence detainee may be involuntarily medicated in order to restore competency for sentencing. In *Sell v. United States* the Supreme Court determined the

---

[*] Of the Southern District of Indiana, sitting by designation.

framework for involuntarily administering antipsychotic drugs to a detainee in order to make him competent to stand trial. 539 U.S. 166 (2003). Because the district court made adequate findings as to each of the four *Sell* factors prior to approving the involuntary medication of Appellant Norman Breedlove, we now affirm.

Breedlove pleaded guilty to various drug trafficking and firearms offenses. In exchange for his testimony against four co-conspirators, the government agreed to request a reduced sentence of ten years.[1] Shortly before his sentencing hearing, Breedlove filed a "Notice of Ineffective Counsel" in which he complained of a conspiracy between his counsel, his co-defendants and the court system. Breedlove was provided new counsel, who recommended that Breedlove be evaluated to determine competence since he was exhibiting signs of paranoid delusion.

Breedlove was first evaluated by Dr. Szyhowski, who diagnosed Breedlove as suffering from paranoid schizophrenia. Breedlove was then committed to custody at a federal medical facility in Butner, North Carolina (Butner). Subsequently, the Bureau of Prisons requested judicial authorization to involuntarily medicate Breedlove with antipsychotic medications pursuant to *Sell*. Accordingly, the district court conducted a *Sell* hearing to determine whether involuntary medication was appropriate. During the hearing the government called two expert witnesses, Dr. Maureen Reardon, a psychologist, and Dr. Sarah Ralston, a psychiatrist who

---

[1] The government calculates that Breedlove's sentence without the plea deal would have carried a mandatory minimum of 25 years, with a maximum sentence of life imprisonment.

jointly authored the forensic report which ultimately recommended involuntary medication. Dr. Reardon, a Board certified forensic psychologist, testified that Breedlove suffered from psychotic symptoms and would require medication to restore his competency. She ultimately settled on a less specific diagnosis than Dr. Szyhowski's of a psychotic disorder not otherwise specified. Dr. Reardon testified that the modified diagnosis was based on uncertainties in her examination of Breedlove, but noted that the treatment and symptoms of each diagnosis were the same. Dr. Reardon also testified that Breedlove exhibited certain positive indicators, which suggested he would respond positively to the antipsychotic medication. In Dr. Reardon's opinion, the delusions that Breedlove suffered from would remain fixed and would both prevent him from consenting to medication and continue to make him incompetent to undergo sentencing. On cross examination Dr. Reardon acknowledged that as a forensic psychologist the treatments she provides are aimed less at individual therapy to improve the patient's quality of life and more at restoring competency. However, she also noted that Breedlove would likely experience several benefits from the treatment, such as reduced stress levels due to the reduction in his paranoid delusions.

Dr. Ralston testified as to the appropriate treatment for Breedlove's condition. In her opinion the involuntary administration of Haloperidol would be substantially likely to restore Breedlove to competency. Dr. Ralston testified that Haloperidol was not only appropriate to restore an inmate's competency, but that she would prescribe it in a clinical setting to a patient with similar symptoms to Breedlove's. Dr. Ralston also detailed the potential side effects of this particular course of treatment, some of which are severe and irre-

versible in their most serious manifestations. Despite the potential for severe side effects, Dr. Ralston was still comfortable with the treatment plan because they would monitor Breedlove for symptoms of any side effects and adjust his treatment plan accordingly. Both doctors testified that Breedlove would be closely monitored while he remained under their care at Butner. However, they also acknowledged that when Breedlove was transferred back to Illinois, they would not have the capacity to monitor him, nor did they know the extent to which those facilities would monitor Breedlove.

The testimony from both doctors was based on hours of face-to-face interview time and observation of Breedlove. Their testimony was also, at least in part, influenced by a study that Dr. Reardon authored with two other colleagues (the Butner study), which examined all federal detainees treated under *Sell* between 2003 and 2009 and determined that 79% of all treatment resulted in restored competency, and that the success rate rose to 93% for individuals with the same disorder as Breedlove.

The defense declined to call any witnesses, but merely submitted the testimony of Dr. Cloninger who suggested that the 79% success-rate figure in the Butner study was too high. This testimony was only brought up in the cross examination of Dr. Ralston, who stated that she disagreed with Dr. Cloninger's assessment. Further, Dr. Cloninger's testimony was not given in connection to this case, but for a *Sell* hearing in the District of Arizona. Dr. Cloninger did not testify in this *Sell* hearing.

Shortly after the *Sell* hearing, Breedlove's counsel moved for reevaluation, to which he attached an affidavit of his own observations of Breedlove's behavior. The motion had no

other evidence showing Breedlove had in fact recovered from his mental disorder. Based on all the evidence presented, the district court granted the request to medicate Breedlove in order to restore his competency. The district court also denied the motion for reevaluation, explaining that the counsel's expertise was in the law, not psychology, and relied on the determinations of the three doctors instead.

## I.

In *Sell* the Court determined that in order to allow involuntary medication of a defendant the government must prove by clear and convincing evidence that: (1) important governmental interests are at stake; (2) involuntary medication will significantly further those state interests; (3) involuntary medication is necessary to further those interests, i.e. no viable alternative exists; and (4) administration of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition. *See Sell*, 539 U.S. at 180–82. We apply de novo review to the district court's determination on issues of law (the first *Sell* factor), and clear error review of its factual findings (*Sell* factors two through four). *United States v. Lyons*, 733 F.3d 777, 782 (7th Cir. 2013); *United States v. Tinnie*, 629 F.3d 749, 751 (7th Cir. 2011).

Sell *factor one: is there an important government interest?*

The first *Sell* factor is the most contentious. In order to satisfy the first element the district court needed to find that "important governmental interests" were at stake. *Sell*, 539 U.S. 181–82. Here, the government's interest is sentencing Breedlove. In *Sell*, the Supreme Court held that the Government has an important interest in bringing an individual ac-

cused of a serious crime to trial. *Id.* This requires us to make two determinations: whether the Government may have an important interest in restoring Breedlove's competency so that he may be sentenced, and more importantly whether Breedlove's crime is "serious." The first *Sell* factor is a purely legal issue, and thus our review is *de novo*.

Initially it is worth noting that Breedlove does not challenge the application of the *Sell* analysis to the sentencing context. Thus, we do not need to pass on the question whether the government has an interest in restoring competency in order to sentence an individual. We will point out however that other courts have determined that *Sell* applies to this context. *See, e.g., United States v. Baldovinos*, 434 F.3d 233, 240-41 (4th Cir. 2006); *United States v. Wood*, 459 F.Supp.2d 451, 457-59 (E.D. Va. 2006).

Instead, we focus our analysis on whether Breedlove's crime was sufficiently serious. Breedlove argues that *Sell* is limited to crimes against the person or property, and as such his crimes—heroin trafficking and possession of a firearm in furtherance—are not serious enough under *Sell* to justify medication. In support, Breedlove cites the Court's language in *Sell*: "The Government's interest in bringing to trial an individual accused of a serious crime is important. That is so whether the offense is a serious crime against the person or a serious crime against property. In both instances the Government seeks to protect through application of the criminal law the basic human need for security." *Sell*, 539 U.S. at 180. Thus, relying on a singular sentence referring to only crimes against the person and property, Breedlove argues that drug trafficking and felony possession of firearms are crimes that are categorically excluded from the *Sell* analysis.

The Fourth, Sixth, Ninth and Tenth Circuits disagree, each holding that *Sell* did not categorically exclude non-violent, non-property crimes. *See e.g.*, *United States v. Hernandez-Vasquez*, 513 F.3d 908, 917 (9th Cir. 2008); *United States v. Green*, 532 F.3d 538, 550 (6th Cir. 2008); *United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1226–27 (10th Cir. 2007); *United States v. Evans*, 404 F.3d 227, 237 n.6 (4th Cir. 2005). Instead, the appropriate consideration is whether any type of crime is serious enough to give rise to an important government interest in light of the individual facts of the case. *See Hernandez-Vasquez*, 531 F.3d at 917–18. Breedlove's rather extreme categorical exclusion of all crimes but those against people and property "would ignore the breadth of the Supreme Court's concern that the Government be able to bring an accused to trial, which it described as 'fundamental to a scheme of ordered liberty.'" *Id.* at 918 (quoting *Sell*, 539 U.S. at 180). Therefore, we will follow the non-categorical approach of our fellow circuits, as we too are convinced that the *Sell* majority did not intend to exclude all non-violent, non-property crimes.

To determine the seriousness of a crime the government, and a majority of the circuits, analogize the Supreme Court's approach in the Sixth Amendment context, which looks to the maximum statutory penalty. *See Evans*, 404 F.3d at 237. Breedlove's crimes carry a maximum statutory penalty of life imprisonment—this severe punishment obviously suggests that his crimes were serious. There is logic in this approach, as the maximum statutory penalty reflects at least some measure of legislative judgment regarding the seriousness of a crime. *See, e.g.*, *Green*, 532 F.3d at 547–48. Breedlove wants us to take into account that his plea agreement would only result in a ten year sentence. However, when we are analyz-

ing the objective seriousness of a crime for the purposes of *Sell*, we are not as concerned with the various factors that shape a reduced sentence, which are after the fact, subjective considerations. *Cf. Green*, 532 F.3d at 548 (indicating a concern that subjective determinations of seriousness lead to disparity among the circuits). Thus, looking at the fact that Breedlove's crimes carry a life penalty, we conclude that his crimes were serious within the meaning of *Sell*.

Finally, regardless of the maximum statutory penalty, it is no stretch to determine that heroin trafficking and felony possession of a firearm are serious crimes. And that while there may be few if any identifiable victims of these crimes, the indirect victims (i.e. those affected by drug violence) are widespread. *See, e.g.*, *Green*, 532 F.3d at 549. We can thus conclude that Breedlove's crimes were sufficiently serious, and affirm the district court's ruling as to the first *Sell* factor.

Sell *factor two: does involuntary medication further the government's interest?*

To satisfy this factor the district court must find that there is clear and convincing evidence that the proposed treatment will be substantially likely to render the defendant competent and that the side effects will not interfere substantially with the defendant's ability to participate in the proceedings. *Sell*, 559 U.S. at 181. The district court, relying on the testimony of Drs. Reardon and Ralston, found that administering the antipsychotic medication would restore Breedlove's competency. In the opinion of the experts, Breedlove displayed positive indicators that suggested he would respond positively to the treatment and that any potential side effects of the treatment would be monitored and addressed so that they would not interfere with restoring Breedlove's compe-

tency. The doctors' testimony was based on personal observation of Breedlove as well as the Butner study, which found that there is a 79% likelihood of success in restoring the competence of federal patients subject to involuntary medication, and a 93% likelihood of success for individuals with the same diagnosis as Breedlove.

Breedlove's primary challenge to this factor is an alleged defect with this study, on which the doctors partially relied in making their conclusions. Breedlove claims that the study is faulty because it had no control group. This challenge fails for two reasons. First, the doctors relied on their personal observation of Breedlove and experience with Haloperidol in addition to the challenged study. Both doctors spent hours observing and interviewing Breedlove, and Dr. Ralston testified that she has prescribed Haloperidol to over 100 patients. Without the study, there was sufficient evidence to satisfy this factor in the absence of contradictory testimony. Moreover, Dr. Reardon testified that the study could not have been performed ethically if it had a control group, and that despite the absence of a control group the study still has value.

Second, Breedlove had scant evidence to support his challenge. Breedlove submitted only one piece of evidence, the testimony of an expert, Dr. Cloninger, from a completely separate *Sell* hearing. This testimony suggested that Drs. Reardon and Ralston's 79% success-rate figure was too high. However, not only did Dr. Cloninger not actually testify at Breedlove's hearing, but his testimony was only brought up once on the cross-examination of Dr. Ralston, who stated that she disagreed with Dr. Cloninger's assessment. Dr. Reardon was not asked about Dr. Cloninger's testimony. As a result, the district court gave more weight regarding the con-

tested study to the opinions of the two experts who were actually present and testified at the *Sell* hearing. In any event, the doctors' conclusions regarding Breedlove's treatment were based on multiple factors in addition to the contested study—the district court did not clearly err in finding this second factor satisfied.

Sell *factor three: are there viable alternatives?*

For the third *Sell* factor, the district court must have found that involuntarily medicating Breedlove is necessary to further the Government's interest. 539 U.S. at 181. In other words, the court must have found that no other alternative, less intrusive treatments were likely to obtain the same results that involuntary medication would. *Id.* In fact, a district court's failure to find that less intrusive treatments would not achieve the same results as forcible medication is grounds for reversal. *United States v. Debenedetto*, 744 F.3d 465, 472–73 (7th Cir. 2013). However, here the district court made a clear finding based on substantial evidence in the record that involuntary medication was necessary and that no viable alternative existed to restore Breedlove's competency.

The record clearly reflected the opinions of Drs. Reardon and Ralston that therapy or other non-medication based treatments would be substantially unlikely to restore Breedlove's competency, because his present mental condition prevents him from participating in those treatments. Moreover, the district court found that the treatment method would follow the least intrusive course possible, only using forced injections if Breedlove refused to take the medication orally. Nothing in the record contradicts this opinion. Instead, in mounting his challenge to this factor Breedlove

again points to the testimony of Dr. Cloninger in which he opines that the Butner study overestimated the likelihood that this involuntary administration of antipsychotics will restore competency. Thus, Breedlove appears to argue that the government cannot sufficiently prove that Breedlove will not regain competency on his own, rendering non-treatment a viable, less intrusive alternative.

This argument fails for two reasons. First, according to the district court, the government's experts convincingly testified to the opposite, that Breedlove will actually experience cognitive decline if his condition is not treated—this was based on personal observation in addition to the Butner study. And second, the court did not credit Breedlove's assertion, through his counsel, that his condition was improving. It appears, then, that there was clear and convincing evidence that administration of Haloperidol was necessary to restore Breedlove's competence and that his competence was unlikely to be restored with alternative treatments, much less no treatment. Given the weight of the evidence from the experts who testified in this hearing and personally observed Breedlove, the district court was justified in affording their testimony greater weight than that of Dr. Cloninger and Breedlove's counsel. We find that the balance of evidence does not suggest the district court clearly erred in finding this factor satisfied.

Sell *factor four: is the treatment medically appropriate?*

The fourth and final factor in the *Sell* analysis is that "administration of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition." *Debenedetto*, 744 F. 3d at 473 (quoting *Sell*, 539 U.S. at 181). This requires that the district court's finding recognize

the defendant's diagnosis and personal medical history. *Id.* at 473.

The crux of Breedlove's challenge to this factor is that the forcible medication is only for the purpose of restoring competency, and that this is not medically appropriate because it does not consider Breedlove's individual interests. However, this argument directly contradicts *Sell*, which explicitly authorized involuntary medication for the limited purpose of restoring competency. *See Sell*, 539 U.S. at 181. To the extent that Breedlove challenges the treatment because of the risk of side-effects, this risk was apparently not significant enough to prevent Drs. Ralston and Reardon from recommending this treatment. In fact, Dr. Ralston testified that she would prescribe this treatment to any member of the community if appropriate, and not just in the *Sell* context. She also testified that Breedlove would likely experience personal benefits, noting that the treatment would "reduce the stress and anxiety caused by his mental illness and improve his overall health." Further, the doctors testified that Breedlove would be closely monitored while they treated him, mitigating some of the risk of side-effects from the treatment. The doctors' testimony was not contradicted, and the district court's findings were not clearly erroneous.

## II.

Breedlove also claims on appeal that the district court did not satisfy its duty to make appropriate findings under *Sell* because it did not provide a sufficiently individualized treatment plan for Breedlove's involuntary medication. To satisfy its duty, the district court must indicate the medication or range of medications to be administered, the dose range and the length of treatment. *See, e.g.*, *United States v.*

*Hernandez Vasquez*, 513 F.3d 908 (9th Cir. 2008); *Evans*, 404 F.3d at 241–42. There is no doubt that the district court's order specified the medication (Haloperidol) and the length of treatment (up to four months). The district court, however, did not include a maximum dosage in its order, which Breedlove contends is a reversible error. We disagree.

The courts that have rejected involuntary treatment plans as insufficiently individualized seemingly did so to prevent the prison medical staff from having "carte blanche to experiment with … dangerous drugs or dangerously high dosages of otherwise safe drugs." *Evans*, 404 F.3d at 241; *see also United States v. Chavez*, 734 F.3d 1247 (10th Cir. 2013); *Hernandez-Vasquez*, 513 F.3d at 917. At the *Sell* hearing the government detailed a specific treatment plan, including dosage amounts, and a detailed plan to address any side effects. The district court discussed this treatment plan at length and left very little doubt that Breedlove would be medicated according to this plan. It did not reiterate every detail in the proposed treatment plan, including dosage levels, but those were clearly defined in the treatment plan. Given the detail of the treatment plan, we find that the district court's analysis here is sufficient to ensure that the prison medical staff does not have unfettered authority to experiment with varying dosage levels or different medications. The cases Breedlove cites to support his argument that maximum dosage is an absolute requirement involve drastically different factual situations—those cases invariably involve unrestricted discretion to the medical staff or vague treatment plans based on little or no evidence of the defendant's individual condition. *See, e.g.*, *Hernandez-Vasquez*, 513 F.3d at 917; *Chavez*, 734 F.3d at 1253. Due to the government's detailed treatment plan, the concerns the Ninth and Tenth Circuits dealt with in

those cases are not implicated. We are therefore content that the district court's instructions and reference to the government's detailed treatment plan satisfied its burden under *Sell*, even if a maximum dosage was not explicitly included in the district court's order.

### III.

The final issue on appeal is whether the district court abused its discretion in denying Breedlove's request to have his competency reexamined. Breedlove's request was supported only by an affidavit from his counsel indicating that, in his counsel's opinion, he was showing signs of improvement in his understanding of the proceedings. This request was submitted a mere three weeks after the *Sell* hearing. We agree with the district court that Breedlove's counsel did not have the expertise to make such a judgment, and his opinion should not be afforded the same weight as the opinions of the three mental health professionals who determined Breedlove was not competent. Given the short proximity in time between this request and the *Sell* hearing as well as the opinions of the evaluating professionals, we find nothing to suggest that denying reexamination was an abuse of discretion.

AFFIRMED.