In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 23-1739

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DARLENE FIESTE,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Central District of Illinois.
No. 22-cr-10001 — **James E. Shadid**, *Judge*

_____

ARGUED SEPTEMBER 7, 2023 — DECIDED OCTOBER 19, 2023

_____

Before BRENNAN, ST. EVE, and JACKSON-AKIWUMI, *Circuit Judges*.

ST. EVE, *Circuit Judge*. Defendant Darlene Fieste faces charges for threatening to assault and murder two federal judges, three former United States presidents, and the current President. She is currently incompetent to stand trial—Fieste struggles with a mental illness that causes her to experience delusions. Now in custody, Fieste has refused the antipsychotic medication that experts believe will restore her

competence. The government therefore has moved for permission to involuntarily medicate her to render her competent to stand trial. The district court granted the motion, but the order is stayed pending this appeal. For the following reasons, we affirm in part, vacate in part, and remand.

## I. Background

Darlene Fieste suffers from a mental illness that leads her to hold the delusional belief that various high-ranking federal officials have sexually abused and raped her. She has struggled with her illness for more than thirty years.

Over the course of several days in December 2021, Fieste sent a series of graphic emails and voicemails threatening to kill federal judges and presidents, all of whom she believed had sexually abused her. The messages began with a voicemail on December 22, 2021, in which Fieste stated:

> Judge [A] is f***in dead. I am going to f***in kill him. Tell all the judges in your federal building in St. Louis, that Judge [A], I'm gonna kill Judge [A]. I am f***ing going to kill him.

Fieste left another voicemail several days later, this time targeting a former president. She stated: "[President B] is a sick f***. I'm gonna put a bullet right in his f***in head."

Other emails and voicemails arrived in the days that followed. Each was violent and targeted the life of a federal official:

- "I WILL SHOOT … JUDGE [A]."
- "I WILL SHOOT … JUDGE [C]."
- "I WILL SHOOT … [PRESIDENT D]."
- "I WILL SHOOT … [PRESIDENT E]."

- "I WILL SHOOT … JOE BIDEN."

A grand jury returned a seven-count indictment charging Fieste with threatening to assault and murder two federal judges, 18 U.S.C. § 115(a)(1)(B), threatening to kill three former presidents, 18 U.S.C. § 879, and threatening to kill the current president, 18 U.S.C. § 871(a). Fieste was arrested on January 20, 2022, and has remained in custody ever since.

Fieste's conduct at her initial appearance prompted the magistrate judge to order a competency evaluation. *See* 18 U.S.C. § 4241(b). Fieste was then transferred to the Federal Medical Center ("FMC") in Carswell, Texas, where several months of psychiatric evaluation ensued.

FMC psychologists submitted their report to the district court on June 7, 2022, concluding that Fieste was not competent to stand trial. They diagnosed Fieste with a "delusional disorder" marked by paranoia and persecutory delusions, which led her to believe numerous individuals had raped her.

FMC examiners noted Fieste's deep fixation with the subject of her delusions. During the evaluation period, Fieste reported a series of sexual assaults perpetrated by prominent national political figures, judges, police officers, and hospital staff. She also harbored paranoid ideas about government officials and federal law enforcement agencies, including the belief that government officials had retaliated against her for complaining about a federal judge.

Fieste's delusions, her evaluators concluded, rendered her incapable of assisting in her own defense. Even though Fieste demonstrated an understanding of court proceedings, her delusions interfered with her rational grasp of the accusations against her and her ability to communicate with her attorney.

FMC psychologists predicted that Fieste's prognosis was "poor" absent medication and treatment. They added, however, that proper treatment was substantially likely to improve her condition.

After receiving the report, both parties stipulated to its findings and the magistrate judge found Fieste incompetent to proceed. The magistrate judge then committed Fieste to the custody of the Attorney General to determine whether there was a substantial probability that she could attain competency in the foreseeable future. *See* 18 U.S.C. § 4241(d)(1).

Over the next four months, Bureau of Prisons psychologist Matthew Opesso performed a competency evaluation for purposes of section 4241(d)(1). In his report to the court, Dr. Opesso observed that Fieste's delusions occupied her thoughts, led to altercations with medical staff and other inmates, and were the subject of almost daily emails she sent to FMC Carswell staff. Dr. Opesso diagnosed Fieste with "bipolar I disorder, current episode manic, with mood congruent psychotic features." He concluded, just as the first evaluation had, that Fieste was incompetent to stand trial because her delusions heavily impaired her abilities to participate in her defense and communicate with her attorneys. Dr. Opesso opined that Fieste's chances of attaining competency to stand trial were poor without medical treatment.

Dr. Opesso also commented on the outcome of psychiatric treatment that Fieste voluntarily underwent during and after the evaluation period. During the evaluation period, Fieste agreed to take several antidepressants and "low-dose antipsychotic medication." Dr. Opesso found these treatments ineffective in addressing her mood instability and delusions. After the evaluation period concluded, Fieste started taking an

injectable antipsychotic, Prolixin. Dr. Opesso observed that Fieste's time taking the Prolixin coincided with some improvement in her condition. He predicted that adhering to the medication would give her a substantial probability of attaining competency.

Not long after Dr. Opesso issued his report, Fieste began to refuse medication. The government then moved to forcibly medicate her to restore her to competency to stand trial under *Sell v. United States*, 539 U.S. 166 (2003). Before the *Sell* hearing, the Bureau of Prisons conducted a separate hearing to determine if involuntary medication was appropriate under *Washington v. Harper*, 494 U.S. 210 (1990), which authorizes involuntary medication if a defendant poses a danger to herself or others while in custody. The Bureau of Prisons concluded that Fieste had not behaved dangerously while in custody, and so involuntary medication was unjustified on that basis.

The court held a *Sell* hearing on March 20, 2023, which primarily revolved around the testimony of three expert witnesses. The government presented two experts: Dr. Opesso, and Dr. Ramya Seeni, Fieste's psychiatrist within the Bureau of Prisons. Fieste, in turn, called a retained psychiatrist, Dr. Michael Byrne, who had met with her for two hours to assess her before the hearing.

At the hearing, the experts disagreed on the appropriate diagnosis for Fieste. Dr. Opesso reiterated his earlier finding that Fieste suffered from bipolar I disorder, current episode manic, with mood-congruent psychotic features. Dr. Seeni agreed. Dr. Byrne, in contrast, diagnosed Fieste with schizoaffective disorder, bipolar type.

Notwithstanding that disagreement, the experts coalesced around an appropriate course of treatment. Each concluded that a long-term injectable antipsychotic medication would be most effective in restoring Fieste to competency. Specifically, Dr. Seeni endorsed Prolixin, the antipsychotic that previously yielded significant improvement in Fieste. Dr. Seeni added that another anti-psychotic, Seroquel, might be an appropriate alternative, but that it would require a higher dosage than Fieste had agreed to take. Dr. Byrne agreed that Prolixin was "one of several appropriate medications." No expert, however, discussed a specific dosage of Prolixin besides acknowledging that identifying an effective dosage was a "trial-and-error process."

The experts further agreed that the medications they recommended carried potential side effects that could require additional medication to control. Those side effects included constipation, dry mouth, tremors, stiffness, shakes, anxiety, GI distress, weight gain, restlessness, short- and long-term involuntary muscle movements, cardiac effects, and even death. To address them, Dr. Seeni recommended Ativan, an anti-anxiety medication Fieste had previously taken to abate the "body-locking symptoms" she was experiencing. Dr. Byrne cautioned that Ativan had potentially addictive effects, but agreed that it would address certain side effects in limited circumstances.

The experts opined that the likelihood Fieste could attain competency for trial depended on her diagnosis. Dr. Opesso testified that "the literature" suggested if Fieste had bipolar disorder, there was an "almost 100 percent" chance she would regain competency; if Fieste suffered from delusional disorder, chances dropped to 73 to 87 percent; if she had

schizoaffective disorder, chances ranged from 76 to 81 percent; and if she had schizophrenia, chances were "about 76 percent." Dr. Seeni testified that bipolar disorder carried a "good" prognosis, but the chances of success dropped to between 32 and 72 percent if Fieste had schizoaffective disorder. Although Dr. Byrne declined to provide exact estimates, he indicated that the prognosis was "much poorer" if Fieste suffered from schizoaffective disorder than if she suffered from bipolar disorder. Despite the experts' varied estimates, all agreed that Fieste's delusions were unlikely to subside completely, even with treatment.

The parties submitted briefs after the hearing. The government also submitted a proposed order authorizing it to medicate Fieste involuntarily. Fieste did not specifically respond to the government's proposed order.

On April 13, 2023, the district court granted the government's motion to involuntarily medicate Fieste. The court's order adopted verbatim the language the government had proposed. It reads in relevant part:

> Defendant may be involuntarily medicated to restore her competence if she does not voluntarily accept medication, in accordance with Dr. Seeni's treatment plan and recommendation for long-acting injectable antipsychotic medication, along with other medications, as outlined in her testimony and as it comports with her best medical judgment; …

> The period of treatment shall be four months from its commencement, which may be extended upon Court approval; …

If there is a change in relevant circumstances, including changes in Defendant's medical condition, Defendant or the Government may move, at any time, to amend this order[.]

Fieste promptly filed an interlocutory appeal and moved to stay the order pending appeal. The district court granted the motion to stay, and we granted Fieste's motion to expedite her appeal.

## II. Analysis

Individuals have a "'significant' constitutionally protected 'liberty interest' in 'avoiding the unwanted administration of antipsychotic drugs.'" *Sell*, 539 U.S. at 178 (quoting *Harper*, 494 U.S. at 221). As the Supreme Court has explained, "[t]he forcible injection of medication into a non-consenting person's body represents a substantial interference with that person's liberty." *Harper*, 494 U.S. at 229. That interference is "particularly severe" in the case of antipsychotic drugs, whose purpose is to alter the patient's brain chemistry. *Riggins v. Nevada*, 504 U.S. 127, 134 (1992).

Accordingly, the government may forcibly medicate a defendant only when an "essential" or "overriding" government interest is at stake. *Id.* at 135. In *Sell*, the Supreme Court held that the government's interest in bringing a mentally incompetent defendant to trial for serious crimes may outweigh the defendant's liberty interest in being free from unwanted medication. 539 U.S. at 179. In these "rare" instances, the Due Process Clause permits the government to medicate a defendant against her will in order to render her competent to stand trial. *Id.* at 179–80.

When the government seeks to involuntarily medicate a defendant for this purpose, "it must meet a higher standard to counterbalance the defendant's right to avoid involuntary medication." *United States v. Debenedetto*, 757 F.3d 547, 552 (7th Cir. 2014). In *Sell*, the Supreme Court determined that in order to justify involuntary medication of a defendant, the government must prove by clear and convincing evidence that: (1) important governmental interests are at stake; (2) involuntary medication will significantly further those interests; (3) involuntary medication is necessary to further those interests; and (4) administration of the drugs is medically appropriate. 539 U.S. at 180–82; *United States v. Breedlove*, 756 F.3d 1036, 1040 (7th Cir. 2014).

Fieste contends that the government did not meet its burden on the first and second *Sell* factors. Above and beyond those shortcomings, Fieste takes issue with the specificity of the district court's *Sell* order. We address each argument in turn.

**A. *Sell* Factor One**

The first *Sell* factor requires a court to find that "*important* governmental interests are at stake." *Sell*, 539 U.S. at 180. As a general matter, the government has an important interest in "bringing to trial an individual accused of a serious crime." *Id.*

We evaluate the seriousness of an offense by looking to its maximum statutory penalty. *Breedlove*, 756 F.3d at 1041; *Debenedetto*, 757 F.3d at 553. Fieste faces charges for threatening to assault and murder two federal judges, three former presidents, and the current president. *See* 18 U.S.C. §§ 115(a)(1)(B), 879(a)(1), 871(a). These crimes carry

maximum penalties of ten years (threatening to assault and murder federal judges) and five years (threatening to kill current and former presidents). No one disputes these are serious offenses within the meaning of *Sell*, and we agree. *See United States v. Evans*, 404 F.3d 227, 238 (4th Cir. 2005) (holding a charge under section 115(a)(1)(B) "is 'serious' under any reasonable standard").

Our measure of the government's interest, however, does not end there. Even when a defendant is charged with a serious crime, "[s]pecial circumstances may lessen the importance" of the government's interest in prosecuting her. *Sell*, 539 U.S. at 180. These include the defendant's lengthy confinement in an institution for the mentally ill, the potential for future confinement if the defendant regains competency, and the amount of time a defendant already has been confined while the charges have been pending. *Id.*; *Debenedetto*, 757 F.3d at 553. Unlike assessment of the seriousness of the crime, consideration of mitigating special circumstances is a fact-intensive inquiry. *Sell*, 539 U.S. at 180; *Debenedetto*, 757 F.3d at 553.

### 1. Standard of Review

We have called the first *Sell* factor a "purely legal issue" that we review de novo. *Breedlove*, 756 F.3d at 1040. At the same time, we recognize the Supreme Court's directive that courts consider the "facts of the individual case" when assessing the government's interest, particularly in the context of a defendant's "special circumstances." *See Sell*, 539 U.S. at 180; *see also Debenedetto*, 757 F.3d at 553 ("In making the determination whether such special circumstances exist, the district court must consider the facts of the individual case."). We review these embedded factual findings relevant to the

court's legal conclusion for clear error. *See Debenedetto*, 757 F.3d at 552–53 ("We review the district court's conclusions of law de novo and its findings of fact for clear error."); *see also United States v. Tucker*, 60 F.4th 879, 886 (4th Cir. 2023); *United States v. Cruz*, 757 F.3d 372, 382 (3d Cir. 2014); *United States v. Brooks*, 750 F.3d 1090, 1096 (9th Cir. 2014); *United States v. Dillon*, 738 F.3d 284, 291 (D.C. Cir. 2013); *United States v. Gutierrez*, 704 F.3d 442, 450 (5th Cir. 2013).

**2. Burden of Proof**

Everyone agrees the government shoulders the ultimate burden of proving by clear and convincing evidence its important interest in prosecution. *See Breedlove*, 756 F.3d at 1040. What is less clear, and of some consequence to this case, is who must show that "special circumstances" sufficiently lessen the government's interest.

The Sixth and Third Circuits require a defendant to come forward with evidence of her special circumstances. "While the ultimate burden of proving an important interest in prosecution always remains with the Government, [the court] look[s] to the defendant to demonstrate that the special circumstances of his case undermine the Government's interest once it is established that he stands accused of a serious crime." *United States v. Mikulich*, 732 F.3d 692, 699 (6th Cir. 2013); *see also Cruz*, 757 F.3d at 382.

That approach sensibly balances the defendant's and the government's competing incentives in *Sell* cases, and we

adopt it here.[1] Asking the defendant to come forward with evidence of mitigating special circumstances appropriately "recognizes the defendant's interest in bringing [those] special circumstances to light." *Cruz*, 757 F.3d at 382. The defendant not only has the best incentive to develop her individual circumstances that undermine the government's interest in prosecution, but she also is in the best position to know them in the first place. At the same time, holding the government to a clear and convincing standard of proof on the ultimate issue of its important interest "affords due regard to the nature of the liberty interest at stake in forced-medication cases." *Dillon*, 738 F.3d at 292.

*    *    *

Turning to the merits, Fieste argues that two special circumstances severely diminish the government's interest in prosecuting her, even for serious crimes: (1) her high likelihood of civil commitment if she is not prosecuted and convicted; and (2) the significant amount of time she will ultimately spend in pretrial detention relative to her likely sentence if convicted. We consider each argument in turn.

### 3. Civil Commitment

Fieste first contends that the high likelihood she will be civilly committed significantly diminishes the government's interest in prosecuting her. *See* 18 U.S.C. § 4246. The civil commitment statute, 18 U.S.C. § 4246, permits a district court to commit an individual to the custody of the Attorney General

---

[1] At oral argument, defense counsel conceded that Fieste has the burden to come forward with evidence of special circumstances.

"[i]f, after [a] hearing, the court finds by clear and convincing evidence that the person is presently suffering from a mental disease or defect as a result of which [her] release would create a substantial risk of bodily injury to another person or serious damage to property of another." In *Sell*, the Court observed that "lengthy confinement in an institution for the mentally ill … would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." 539 U.S. at 180. The Court did not "suggest that civil commitment is a substitute for a criminal trial"; rather, it held that "[t]he potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution." *Id.*

Fieste argues for the first time on appeal that the likelihood of civil confinement counsels against forcibly medicating her. Despite not raising this argument during the *Sell* hearing, Fieste insists that civil commitment was "clearly broached" and that the record is "replete with evidence" showing that Fieste "almost certainly" will be civilly committed. We disagree on both counts.

The parties scarcely discussed civil commitment during the *Sell* proceedings. It came up twice, and only procedurally. At the outset of the hearing, the district court asked the parties what the "next step" was "procedurally," if the government failed to meet its burden under *Sell*. The government responded that "the next step would be to have an evaluation done for commitment under … [section] 4246." Defense counsel agreed. Later, the government reiterated that it would seek an evaluation under section 4246 as "alternative relief" to involuntary medication under *Sell*. These brief procedural

discussions alone are insufficient to flag the issue as a mitigating circumstance.

Moreover, not one of the experts opined on Fieste's dangerousness under the civil commitment standard. In fact, the experts expressly distanced themselves from commenting on the issue. Dr. Opesso noted that his analysis did not focus on Fieste's dangerousness, underscoring that civil commitment "would require an additional and different type of interview." Dr. Byrne likewise stressed that an assessment for dangerousness "wasn't the primary target … of the evaluation," and that he was "not opining to [the] standard" of civil commitment.

By contrast, the parties themselves discussed civil commitment in the cases on which Fieste relies. In *Debenedetto*, for example, defense counsel mentioned that the likelihood of civil commitment diminished the government's prosecutorial interest. We remanded because the district court's order "was silent on how th[at] special circumstance factored into its analysis." 757 F.3d at 553. The Sixth Circuit similarly reversed in *United States v. Grigsby* because the district court "did not specifically address [the expert's] testimony regarding potential civil commitment under § 4246 when analyzing whether the government's interest in prosecution is mitigated by the special circumstance of potential lengthy civil commitment." 712 F.3d 964, 970–71 (6th Cir. 2013). There, too, the parties had raised the issue of civil commitment—the government's expert substantively discussed the likelihood of civil commitment and indicated that FMC medical staff would support civil commitment if the defendant was not forcibly medicated for trial. *Id.* The throughline in these cases is that the district

court erred because it failed to address a topic the parties had themselves presented. That was not the case here.

We disagree with Fieste that the district court was obliged to consider the likelihood of civil commitment regardless of whether she raised it. *Sell* instructs no differently. Although the *Sell* Court held that district courts "must consider the facts of the individual case in evaluating the Government's interest in prosecution," that mandate does not relieve defendants of the duty to bring those facts to light in the first place.[2] *See* 539 U.S. at 180.

Of course, once a defendant raises civil commitment (or any other special circumstance), the district court must consider it. But here the court had nothing to address and so committed no error. [3] *See Dillon*, 738 F.3d at 287 (finding no error

---

[2] Indeed, it is not uncommon for defendants to bear the burden of raising affirmative defenses they wish to assert. *See Walsh v. Mellas*, 837 F.2d 789, 799 (7th Cir. 1988) ("[A]ffirmative defenses upon which the defendants bear the burden of proof … may be deemed as waived if not properly and timely presented before the district court.").

[3] To the extent Fieste asks us to consider her forfeited argument on appeal, we find no plain error. *United States v. Macias*, 927 F.3d 985, 989 (7th Cir. 2019). Fieste has not shown that the district court's failure to analyze the possibility of civil commitment had "an effect on h[er] substantial rights—that is, a 'reasonable probability that, but for the error, the outcome of the proceeding would have been different." *United States v. Smartt*, 58 F.4th 358, 362 (7th Cir. 2023) (quoting *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016)). It is far from clear from the underdeveloped record that Fieste would face civil commitment. Further, the Bureau of Prisons concluded that involuntary medication under *Harper* was unjustified because Fieste did not present a danger to herself or others while in custody, a finding that "suggest[s] that it is far from certain that [Fieste]

where the defendant "did not argue to the District Court, as he does now, that he was likely to be civilly confined and that his probable confinement constituted a 'special circumstance' weakening the Government's interest in prosecution"); *United States v. Gillenwater*, 749 F.3d 1094, 1101 (9th Cir. 2014) (same where "nothing in the record" suggested eligibility for civil commitment and "none of the experts who evaluated [the defendant] took a position on that issue"); *Gutierrez*, 704 F.3d at 450 (same, even though "[t]he district court did not even set forth the elements required for civil commitment, much less discuss how or why [the defendant] would satisfy them for the remainder of his life"); *United States v. Green*, 532 F.3d 538, 551 (6th Cir. 2008) (same where the defendant "d[id] not argue that such circumstances exist, and neither expert indicated that [the defendant] would be a candidate for civil commitment"). *But see United States v. Brooks*, 750 F.3d 1090, 1097 (9th Cir. 2014) (holding "the district court must consider …. the potential for and anticipated length of future civil commitment" and remanding where it was "not clear from the record that the district court conducted this inquiry").

### 4. Pretrial Confinement

Fieste next argues that the government's interest in prosecuting her is significantly diminished because, by the time involuntary treatment restores her competence and trial

---

would be eligible for civil commitment." *Gutierrez*, 704 F.3d at 450. Fieste herself consistently asserted that she was not dangerous. *See Dillon*, 738 F.3d at 294 (reasoning that the defendant's "consistent assertions that he is *not* dangerous serve only to dilute any argument that [he] is likely to be civilly confined"). We do not decide the civil commitment question one way or the other today.

concludes, she will have spent significantly more time incarcerated than her expected sentence. Fieste's lengthy stay in pretrial detention no doubt warrants meaningful consideration. Even so, that pretrial detention does not extinguish the government's prosecutorial interests here.

The government's interest in prosecution is lessened when "the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed)." *Sell*, 539 U.S. at 180 (citation omitted). This is because a particularly long period of pretrial confinement reduces, or even eliminates, the amount of prison time a defendant will serve. *See* 18 U.S.C. § 3585(b)(1) ("A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences as a result of the offense for which the sentence was imposed.").

That is especially true when a defendant faces a sentence of time served. As a matter of specific deterrence, sentences of time served diminish the government's interest in prosecution because the defendant receives no additional period of incarceration after her conviction. *United States v. Berry*, 911 F.3d 354, 363 (6th Cir. 2018) ("Where a defendant has already served sufficient time that a guilty verdict will result only in a sentence of time served, the deterrent effect of imprisonment has evaporated, and the overall governmental interest in prosecution is weakened.").

### a. Measuring Pretrial Confinement

The *Sell* court noted only that pretrial confinement must be "significant" to diminish the government's interest in prosecution. *Sell*, 539 U.S. at 180. Circuit courts to consider the

issue of "significant with respect to what" have adopted different approaches. The Second, Fifth, and Tenth Circuits compare pretrial confinement to the statutory maximum sentence of the defendant's accused crimes. *See Gutierrez*, 704 F.3d at 451, *United States v. Bradley*, 417 F.3d 1107, 1117 (10th Cir. 2005); *United States v. Gomes*, 387 F.3d 157, 160 (2d Cir. 2004). The Fourth, Sixth, and Ninth circuits, on the other hand, use a defendant's Guidelines range to measure the significance of pretrial detention under the first *Sell* factor.[4] *See Grigsby*, 712 F.3d at 973–74; *White*, 620 F.3d at 414; *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 694 (9th Cir. 2010).

We need not wade into that debate today because the government forfeited any argument that the statutory maximum Fieste faces—and not her Guidelines range—should be used to measure the significance of her pretrial detention. During the *Sell* proceedings, Fieste repeatedly argued that her Guidelines range and expected sentence governed the pretrial-confinement analysis. The government never took the position that the statutory maximum was instead the proper measuring stick until it submitted its brief to this court. Nor did the government contest the parties' purported agreement about Fieste's anticipated Guidelines range. The government's

---

[4] The Eighth Circuit has suggested that it considers both the statutory maximum and a defendant's likely sentence under the Guidelines. *See United States v. Nicklas*, 623 F.3d 1175, 1179 n.5 (8th Cir. 2010) ("Although the projected Guidelines sentence is relevant to this factor, in a review at this stage of the proceedings, we place greater weight on the statutory maximum. We decline to rely heavily upon a 'sentencing proceeding … [conducted] without the benefit of a presentence report and the facts necessary to conduct such a proceeding.'" (quoting *United States v. White,* 620 F.3d 401, 428–29 (4th Cir. 2010) (Niemeyer, J., dissenting))).

failure to object in the court below forfeits plenary review of the issue on appeal. *Macias*, 927 F.3d at 989.

Our review is therefore limited to correcting plain error. Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 732 (1993); *Smartt*, 58 F.4th at 362. Under that "stringent" legal standard, the government must establish that (1) an error occurred; (2) the error was "plain,"—i.e., obvious or clear; (3) the error affected substantial rights; and (4) the error seriously affected the fairness, integrity or public reputation of the proceedings. *Smartt*, 58 F.4th at 362 (quoting *United States v. Nance*, 236 F.3d 820, 825 (7th Cir. 2000)).

The district court did not plainly err when it relied on Fieste's anticipated Guidelines range to evaluate the significance of her pretrial detention. For one thing, the disagreement among the courts of appeals and the lack of controlling precedent in our circuit prevent us from concluding that any error by the court was "clear or obvious." *United States v. Hopper*, 11 F.4th 561, 572 (7th Cir. 2021).

We also cannot say that the district court's determination seriously affected the fairness, integrity, or public reputation of the proceedings. *See Smartt*, 58 F.4th at 362. Even using the more favorable comparator of Fieste's anticipated Guidelines range as its point of reference, the district court correctly concluded that Fieste's pretrial detention does not by itself displace the government's interests in prosecution. No matter the measuring stick—the Guidelines or the statutory maximum—the government prevails under *Sell* factor one.

### b. Fieste's Pretrial Confinement

The Court correctly noted that "the parties anticipate a sentencing guideline range of 12 to 18 months" and that Fieste

will "likely face a sentence of time served" if convicted. Indeed, Fieste's pretrial detention threatens to nearly double her anticipated Guidelines range by the time sentencing comes around. At the time of oral argument, Fieste already had spent nearly twenty months in pretrial confinement. She will spend even more time in custody if forcibly medicated and prosecution continues. As the parties agreed, medicating Fieste to the point of competency would consume at least four more months. At the end of the day, it is safe to say that Fieste faces at least thirty months in pretrial confinement.

Pretrial confinement almost two times in excess of a defendant's likely sentence undoubtedly qualifies as "significant" for purposes of the first *Sell* factor. *See White*, 620 F.3d at 414 ("Because White will likely be entitled to credit for having served a period of approximately 57.7 months by the time she is tried, and if convicted, will be unlikely to be sentenced to more than 42–51 months, we find that White has been confined for 'a significant amount of time' in light of her likely sentence."). The fact that Fieste likely faces a sentence of time served diminishes, to some extent, the government's interest in prosecuting her. *See Berry*, 911 F.3d at 363 ("The fact that Berry will likely not receive additional time significantly undercuts the government's interest in prosecuting him."); *Grigsby*, 712 F.3d at 974 (finding that the government's interest was diminished under the first *Sell* factor where the defendant "may remain in federal detention for a period roughly equivalent to the length of any prison sentence he may ultimately receive").

Even so, the district court correctly recognized that a defendant's pretrial confinement "affects, but does not totally undermine, the strength of the need for prosecution." 539 U.S.

at 180; *United States v. Bush*, 585 F.3d 806, 815 (4th Cir. 2009) (finding that a potential sentence of time served "alone does not defeat the government's interest" (quotation marks omitted)). That principle is even more relevant here, where the government has shown it has a particularly strong prosecutorial interests at stake.

Fieste is charged with unquestionably violent crimes: threatening to assault and murder two federal judges and four presidents. She sent graphic messages promising to "put a bullet" in the heads of these officials, and her threats did not stand alone. Fieste formulated a plan to illegally obtain a firearm, and Fieste's treating psychiatrist testified that she believed Fieste capable of following through with her threats. This kind of conduct undeniably undermines "the basic human need for security," *Sell*, 539 U.S. at 180, and its violent nature intensifies the government's interests in prosecution, *see United States v. Onuoha*, 820 F.3d 1049, 1055 (9th Cir. 2016); *Cruz*, 757 F.3d at 387 (recognizing the government's interest in "preserving 'human security'"); *White*, 620 F.3d at 414, 419 (distinguishing violent crimes from non-violent crimes in cases authorizing involuntary medication and noting that "[n]ot every serious crime is equally serious"); *Nicklas*, 623 F.3d at 1180 ("[T]he government has a stronger interest in bringing a defendant who threatens to murder FBI agents to trial than it does in a case involving non-violent crime").

It is no small matter either that Fieste directed her threats toward public officials. In prosecuting Fieste, "the government is seeking to protect the very integrity of our system of government." *Gillenwater*, 749 F.3d at 1101. Indeed, every court of appeals to consider a defendant facing similar charges has found that the government met its burden on the

first *Sell* factor. *See, e.g., Gutierrez*, 704 F.3d at 450–51; *United States v. Palmer*, 507 F.3d 300, 303–04 (5th Cir. 2007); *Dillon*, 738 F.3d at 287; *Evans*, 404 F.3d at 238; *Cruz*, 757 F.3d at 386–87; *United States v. Seaton*, 773 F. App'x 1013, 1017–19 (10th Cir. 2019); *United States v. Springs*, 687 F. App'x 672, 674 (9th Cir. 2017); *United States v. Pfeifer*, 661 F. App'x 618, 619 (11th Cir. 2016).

The successful prosecution of these crimes will also promote general deterrence. *See Furman v. Georgia*, 408 U.S. 238, 343 (1972) (per curiam) (Marshall, J., concurring) ("Our jurisprudence has always accepted deterrence in general, deterrence of individual recidivism, isolation of dangerous persons, and rehabilitation as proper goals of punishment."). Prosecuting Fieste conveys society's condemnation of the alleged conduct and provides a deterrent to others from following in her footsteps.

Several other considerations also make it important to bring Fieste to trial. First, Fieste's actions take place amidst an alarming uptick in violent threats against public officials. *See* Peter Simi & Seamus Hughes, *Understanding Threats to Public Officials* (2023), available at https://www.un-omaha.edu/ncite/news/2023/08/re-edit-simi-report.pdf; *see also* Lisa Hagen, *Violent Threats Against Public Officials are Rising. Here's Why*, NPR (Aug. 12, 2023, 5:00 AM), https://www.npr.org/2023/08/12/1193463117/violent-threats-against-public-officials-are-rising-heres-why. The government's imperative to demonstrate intolerance of political violence—which weakens our institutions of government and undermines democracy—has rarely been higher.

Second, conviction would limit Fieste's ability to obtain and own a firearm, 18 U.S.C. § 922(d)(1), (g)(1), diminishing

her ability to carry out her threats in the future and furthering the government's interest in public safety.[5] *See Bush*, 585 F.3d at 815 ("[T]he fact of a conviction would create certain limitations on Bush's subsequent activities, such as her ability to obtain and own firearms, which may be particularly important where, as here, Bush is charged with making threats against federal judges.").

Third, a conviction will likely subject Fieste to a period of supervised release. *See* 18 U.S.C. § 3585. That sanction—unavailable in civil commitment proceedings—ensures Fieste is subject to appropriate monitoring and allows the government to protect the public from future crimes. *See Bush*, 585 F.3d at 815. We find the possibility of supervised release particularly relevant here given Fieste's long struggle with mental illness. *See Gillenwater*, 749 F.3d at 1102 ("[T]he monitoring that accompanies supervised release may be especially valuable here because Gillenwater allegedly persisted in making threats despite law enforcement intervention."). Fieste's delusions that myriad individuals are raping her have persisted for over thirty years and there is no guarantee that medication will fully abate them. Pursuing supervised release in the interest

---

[5] We put lesser weight on this consideration given that Fieste will forever be prohibited from owning firearms by virtue of the district court's earlier finding of mental incompetence. *See* 18 U.S.C. § 922(g)(4) (prohibiting firearm possession by "any person who has been adjudicated as a mental defective or who has been committed to a mental institution"). A firearm prohibition will follow Fieste regardless of the outcome of any prosecution in this case. *White*, 620 F.3d at 420 (noting that the defendant's "commitment in the prison mental hospital forever limits her from certain activities, such as her ability to obtain and own firearms").

of public safety gives the government further reason to prosecute this case.

In sum, the district court correctly concluded—even with Fieste's anticipated Guidelines range as its chosen measuring stick—that Fieste's pretrial detention is "insufficient to overcome the government's interest in prosecution." We therefore find that the government has met its burden under *Sell* factor one based on the facts of this case.

**B. *Sell* Factor Two**

Fieste next challenges the district court's finding on the second *Sell* factor. To satisfy the second *Sell* factor, the district court must find by clear and convincing evidence that (1) the proposed treatment plan is substantially likely to render the defendant competent, and (2) that the side effects are substantially unlikely to significantly interfere with the defendant's ability to participate in the proceedings. *Sell*, 539 U.S. at 181; *Breedlove*, 756 F.3d at 1041. We review the district court's conclusion on this factor for clear error. *Breedlove*, 756 F.3d at 1040.

At the *Sell* hearing, the experts coalesced around a treatment plan: long-acting injectable antipsychotic medications. The success of that treatment plan, however, varied depending on the diagnosis, about which there was some disagreement. Dr. Opesso, relying in part on scientific literature on the subject, estimated that the chances of successful treatment ranged from likely to nearly certain. Specifically, he opined that if Fieste had bipolar disorder, there was an "almost 100 percent" chance that she would regain competency; if Fieste suffered from delusional disorder, chances dropped to 73 to 87 percent; if she had schizoaffective disorder, chances ranged from 76 to 81 percent; and if she had schizophrenia, chances

were "about 76 percent." Dr. Seeni agreed that a "very high percentage of people with Miss Fieste's diagnosis can be restored to legal competency." On cross examination, she testified that bipolar disorder carried a "good" prognosis, but chances of success dropped to between 32 and 72 percent if Fieste had schizoaffective disorder. Dr. Byrne did not provide exact numbers, but nonetheless asserted that the prognosis was "much poorer" if Fieste suffered from schizoaffective disorder than if she suffered from bipolar disorder.

The district court credited Dr. Opesso's testimony and found that Fieste faced "at worst" a 73 percent chance of restoration. It therefore concluded that administering antipsychotic medication was substantially likely to restore Fieste to competency.

Fieste principally faults that conclusion for what she perceives as the district court's overreliance on generalized statistics, rather than individualized findings. The district court (relying on Dr. Opesso's testimony) did no such thing. To be sure, Dr. Opesso grounded his prognoses in generalized "research literature." He confirmed that he had reviewed "multiple articles," and that "research … suggest[ed]" the numerical estimates he provided. He prefaced those estimates, however, with the clarification that Fieste's specific situation and his professional judgment informed his ultimate conclusions. He testified:

> So, it's hard to predict the exact outcome for any specific person, but *I look at Miss Fieste's case*, and I compare it to what does the research literature say about effectiveness rates for competency restoration with antipsychotic medication. That helps me form my opinion.

Later, the government asked Dr. Opesso if he had other reasons to believe that Fieste could be restored to competency "beyond the literature on [the] subject." He did. Dr. Opesso reiterated that his personal observations of Fieste supported his conclusion. He, along with other health professionals, had seen "dramatic improvement" while Fieste was voluntarily taking Prolixin. The fact that Fieste was "significantly calmer," "express[ed] the delusional material significantly less often," and had generally stopped acting on her delusions reinforced his judgment that Fieste could be restored to competency.

In other words, Dr. Opesso's predictions were a product of "multiple factors": scientific literature, personal examination, and the marked improvement he observed during treatment. *Breedlove*, 756 F.3d at 1042. That is precisely the kind of holistic assessment the district court was entitled to credit. The district court did not clearly err in finding the second *Sell* factor satisfied.[6]

**C. Adequacy of the *Sell* Order**

Finally, Fieste argues that the district court erred by imposing a *Sell* order lacking constraints on the medications and dosages that her doctor could administer. We agree.

---

[6] Fieste also raises the district court's apparent failure to adequately consider the impact of the side effects of treatment. She faults the district court for finding that side effects could be "managed," despite not knowing the specific medication regime and dosage that doctors would choose. Because this issue relates closely to Fieste's next argument—that the district court erred by not specifying a dosage range in its *Sell* order—we take it up in the following section.

The government cries waiver, primarily based on a brief exchange during the *Sell* hearing. During Dr. Opesso's testimony, the district court asked about the proposed treatment plan:

> The Court: I guess what I'm asking, though, is if I find that she should be involuntarily medicated, then do you—are you guys asking me to decide, based upon what I hear, what that course of treatment should be? Or, once I've made that decision, that course of treatment is going to belong to the experts, correct?

> Government: Correct, Your Honor. Yes, we're not asking the Court to determine dosages and things of that nature.

> The Court: Okay. Very good.

> Defense Counsel: Correct.

The government views that "correct" as an agreement to a dosage-less *Sell* order. A reading of the transcript does not support that notion. The district court's question merely sought to confirm that its role was not to determine dosage ranges *by itself*. That is, the district court correctly understood that questions of dosages (and all medical determinations) "belong[ed] to the experts." There is nothing inconsistent about agreeing that the district court should defer to the experts on the course of treatment and later arguing that the court ultimately failed to constrain that course of treatment in its *Sell* order by specifying a dosage range. Defense counsel's endorsement that it was "not asking *the Court* to determine dosages" does not waive Fieste's right to later challenge the *Sell* order.

The context of the exchange further undermines the government's waiver argument. Dr. Opesso is a clinical psychologist, not a psychiatrist. As the government conceded at oral argument, he was not qualified to opine on medication. That was the domain of the psychiatrists, who had yet to take the stand. Waiver is not appropriate under these circumstances.[7]

We thus turn to the merits, which are relatively straightforward. In *Breedlove*, we held that "the district court must indicate the medication or range of medications to be administered, the dose range and the length of treatment." 756 F.3d at 1043. The court's order here instructed only that Fieste be involuntarily medicated "in accordance with Dr. Seeni's treatment plan and recommendation for long-acting injectable anti-psychotic medication, along with other medications, as outlined in her testimony and as it comports with her best medical judgment." Dr. Seeni's testimony, however, failed to address dosage.[8] The record thus stands in stark contrast from the one we encountered in *Breedlove*, which "discussed [the] treatment plan at length and left very little doubt that [the

---

[7] The government also argues that Fieste waived the issue by failing to raise concerns with the government-proposed *Sell* order. At worst, this would amount to forfeiture—in which case we would nonetheless find plain error, given a defendant's significant liberty interest in avoiding forcible medication and our clear directive in *Breedlove* that *Sell* orders provide a dosage range. *See United States v. Dridi*, 952 F.3d 893, 898 (7th Cir. 2020) ("We construe waiver principles liberally in favor of the defendant."); *United States v. Castaneda*, 77 F.4th 611, 615 (7th Cir. 2023) (plain error requires a clear or obvious error that affects substantial rights).

[8] The government urges us to read the order as reaching back to the dosage of Prolixin that Fieste was taking historically, meaning before she began to refuse medication. Nothing in Dr. Seeni's testimony suggests that she intended to adopt those same dosages going forward.

defendant] would be medicated according to this plan." 756 F.3d at 1044. The failure to mention dosage here results in an order lacking the "high level of detail" that the *Sell* inquiry demands. *United States v. Chavez*, 734 F.3d 1247, 1252 (10th Cir. 2013).

Additionally, a *Sell* order must "ensure that the prison medical staff does not have unfettered authority to experiment with … different medications." *Breedlove*, 756 F.3d at 1044. The district court's order permitting Fieste to be medicated with "long-acting injectable anti-psychotic medication, *along with other medications*" suggests a flexibility to administer unspecified medication that *Sell* does not allow. *See* 539 U.S. at 181. While the district court may have intended its order to encompass only those medications "outlined in [Dr. Seeni's] testimony" (such as those to counter side effects), the district court should clarify that limit on the medical staff's discretion on remand.

We do not fault the district court for deferring to Fieste's treating psychiatrist when imposing its *Sell* order. *Sell* does not demand that courts "micromanage all aspects of a defendant's treatment" and sensibly so—they are ill-equipped for the task. *See United States v. Hernandez-Vasquez*, 513 F.3d 908, 917 (9th Cir. 2008). Judges, after all, are not doctors. And as this case illustrates, identifying an effective dosage for a particular patient is inevitably a trial-and-error process in which calibration and recalibration will inevitably occur.

But the district court must provide a dosage range based on the expert's recommendation or some other appropriate evidence, whether directly in its order or by incorporating a sufficiently detailed treatment plan. Dosage ranges, along with the other details we recognized in *Breedlove*, are

meaningful constraints that protect defendants from the physician's unfettered discretion to forcibly administer potentially dangerous amounts of antipsychotic drugs. *Breedlove*, 756 F.3d at 1043–44; *see also Evans*, 404 F.3d at 241 ("To approve of a treatment plan without knowing the proposed medication and dose range would give prison medical staff carte blanche to experiment with what might even be dangerous drugs or dangerously high dosages of otherwise safe drugs and would not give defense counsel and experts a meaningful ability to challenge the propriety of the proposed treatment."); *see also Hernandez-Vasquez*, 513 F.3d at 917.

To be clear, we do not expect district courts to pin down with certainty a specific dose of a medication for a particular defendant. Rather, the dosage *range* that the district court imposes should be "broad enough" to give physicians reasonable latitude to properly treat the defendant and respond to changes in her condition. *Hernandez-Vasquez*, 513 F.3d at 917; *see also Chavez*, 734 F.3d at 1254 ("[W]e are mindful of the balance we must strike between the judicial oversight necessary to protect defendants' constitutional rights and the need of prison medical staff to retain a degree of flexibility in order to provide effective treatment."). Additionally, nothing forbids the government or the defendant from moving to alter or amend a court's *Sell* order as things change. But here, the court's order does not meaningfully limit Fieste's treatment within a specified dosage range. We therefore vacate and remand for further proceedings.

### III. Conclusion

In sum, we affirm the district court's conclusions that the government has important interests at stake in prosecuting Fieste, and that involuntarily medicating Fieste will

significantly further those interests. The district court need not reconsider these issues on remand. But because the district court's order did not include a dosage range, we vacate the order and remand for the limited purpose of resolving that issue.

One final note. We expedited Fieste's appeal, and we ask that the district court act with similar alacrity on remand. If convicted, Fieste will likely have spent nearly twice the length of her anticipated Guidelines range sentence in custody. All proceedings should be expedited to avoid prolonging Fieste's pretrial detention any longer than absolutely necessary.

For the foregoing reasons, the district court's *Sell* order is AFFIRMED in part, VACATED in part, and REMANDED.

We granted the request to expedite the appeal. We exercise our authority to expedite the issuance of the mandate and adjust the hearing deadlines. Fed. R. App. P. 35(c), 40(a), 41(b); *see, e.g.*, *Boucher v. Sch. Bd. Of Sch. Dist. of Greenfield*, 134 F.3d 821, 829 (7th Cir. 1998). The mandate shall issue seven days after the date this opinion is issued. A petition for panel or en banc rehearing must be filed within seven days after the issuance of this opinion. A petition for rehearing shall stay issuance of the mandate until disposition of the petition. If the petition is denied, the mandate shall issue immediately upon denial.